Marie Williams HUGHES and
Joseph P. Hughes,

v.

Robert D. LIPSCHER, Conrad
J. Roncati, Stephen W.
Townsend.

Civ. A. No. 89–492.

United States District Court,
D. New Jersey.

May 16, 1994.

Marsha Wenk, American Civ. Liberties Union of NJ, Newark, NJ, for plaintiffs.

Michael L. Diller, Sr. Deputy Atty. Gen., Deborah T. Poritz, Atty. Gen. of NJ, Trenton, NJ, for defendants.

## OPINION

POLITAN, District Judge.

This matter is presently before the Court on the application of plaintiffs for attorneys' fees pursuant to 42 U.S.C. § 1988. I heard oral argument in this matter on March 7, 1994 and reserved decision. The instant application calls for a resolution to the questions of (1) whether the named defendants were insulated against an award of attorneys' fees via the doctrine of legislative immunity, (2) whether the plaintiffs satisfied the prevailing party prerequisite required by § 1988 and, if so, (3) whether their claimed attorneys' fees were in fact reasonable. I address each issue *in seriatim.* For the reasons expressed herein, plaintiffs' application for attorneys' fees is hereby **GRANTED** in part.

### I. STATEMENT OF FACTS

The facts giving rise to this case have been set forth in full in a prior decision of this Court and hence need not be exhaustively restated. *See Hughes v. Lipscher,* 720 F.Supp. 454 (D.N.J.1989), *vacated and remanded,* 906 F.2d 961 (3rd Cir.1990). Presently it is sufficient to note that in 1988 Marie Williams, the municipal court clerk in the Borough of North Arlington, married Joseph Hughes, a detective with the North Arlington Police Department. The marriage seemingly ran afoul of a New Jersey Supreme Court directive (Bulletin Letter No. 5/6–77—"Spouse, Parent or Child of Law Enforcement Officer Serving as Court Clerk or Deputy Court Clerk"), issued through the Administrative Office of the Courts ("AOC"), which provided that "after August 1, 1977 no court clerk or deputy court clerk of a municipal court may be appointed or designated if that person has a spouse, parent or child who is or becomes a police officer serving on the police force in that municipality." Upon being informed by Dr. Conrad J. Roncati, the Trial Court Administrator of Bergen County, that the Bulletin Letter was indeed applicable to the Hughes's employment/marital situation, and that "pending resolution of this matter [Mrs. Hughes] is to be recused from any matter involving the spouse in Municipal Court," the Hughes filed a Complaint in fed-

eral court seeking a preliminary and permanent injunction to prevent enforcement of the Bulletin Letter.

Defendants responded to plaintiffs' request for an injunction by filing a motion to dismiss, or alternatively, for summary judgment. I denied defendants' motions and decided the constitutional issues before me by concluding that the Bulletin Letter violated plaintiffs' fundamental equal protection and substantive due process rights. *Hughes,* 720 F.Supp. at 462. In so holding, I permanently enjoined defendants from enforcing the offending Bulletin Letter against plaintiffs or any other similarly situated municipal employees. *Id.*

Following my decision, plaintiffs filed a motion for fees and costs together with supporting affidavits seeking fees through October 19, 1989 in the amount of $48,400.00 and costs in the amount of $3,668.11. Plaintiffs specifically reserved "the right to seek additional reimbursement of attorneys' fees and costs, should additional litigation of this case, including litigation of the issue of attorneys' fees and costs, be necessary." Certification of Lisa Agresti Carey, ¶ 4.

Defendants opposed both the fee application and further appealed the underlying substantive decision to the Court of Appeals for the Third Circuit.[1] On appeal, the Third Circuit vacated the Opinion and Order of this Court and, applying *Pullman* abstention, remanded the case with instructions to abstain pending an authoritative decision by the New Jersey Supreme Court, as that court's resolution of issues of state law could "moot or change the analysis of the federal constitutional issue." 906 F.2d 961, 964 (3rd Cir. 1990). This Court retained jurisdiction.

On January 1, 1992, prior to the filing of any pleadings in the New Jersey state courts, Robert Lipscher, the Director of the Administrative Office of the Courts, issued Directive No. 1–92 regarding the New Jersey Supreme Court's policy pertaining to munici-

pal court administrators and deputy administrators who are spouses, parents or offspring of police officers in that municipality.[2] The new Directive was promulgated to withdraw specifically that portion of Bulletin Letter No. 5/6–77 which prohibited marriage between a court clerk and a police officer employed in the same municipality. *See* Directive No. 1–92, Jan. 1, 1992. Under the terms of Directive No. 1–92, a court administrator who, after his or her appointment marries or cohabits with a police officer, or an administrator whose spouse, child or parent subsequently becomes a police officer, is no longer barred from continued employment as a municipal court administrator or deputy administrator, but is simply disqualified from participating in matters in which that related officer has been involved in some way. Directive No. 1–92 at 2. The Directive itself indicates that its present provisions replace the dictates of the 1977 Bulletin Letter, and notes further that the 1977 policy "should not be interpreted as barring an administrator, after appointment, from such a marriage [to a police officer] since the personal consequences of such a prohibition may be excessively severe." *Id.* at 3.

On August 23, 1993 the New Jersey Supreme Court adopted Canon 7 of the Code of Conduct for Judiciary Employees, which had been proposed by the Supreme Court Committee on Professional and Outside Activities of Judiciary Personnel. Canon 7 reads, in pertinent part:

D. Persons shall not be appointed as court employees when their relatives are employees of a law-enforcement agency within the same unit of government and when that appointment creates an appearance that the law-enforcement agency may have an improper influence over court matters. Nothing contained herein shall diminish the restrictions imposed by the various court directives following the decision in *Hughes v. Lipscher,* 720 F.Supp. 454

---

1. After plaintiffs responded to defendants' opposition to the motion for fees by submitting a letter brief and certification requesting an additional $2,350.00 in fees and $235.79 in costs, the motion was held in abeyance pending appeal.

2. Between the filing of this litigation and the issuance of the 1992 directive, the New Jersey Legislature amended the statutes to redesignate municipal court clerks and deputy clerks as municipal court administrators and deputy administrators.

(D.N.J.1989), vacated 906 F.2d 961 (3rd Cir.1990), which shall remain in full force and effect.

> *Comment:* Employees are referred to Directive # 1–92, "Supreme Court Policy Governing Municipal Court Administrators and Deputy Administrators Who Are Married to or Are the Parents or Children of Police Officers," and any subsequent Directives on this or related topics.

Code of Conduct for Judiciary Employees, Canon 7.D (codified at N.J.Ct.R. 1:17A (West 1994)).

It is the contention of plaintiffs, through their attorneys the American Civil Liberties Union—New Jersey ("ACLU–NJ"), that the Supreme Court's adoption of Part D of Canon 7, which incorporates the limitations of Directive No. 1–92, is an authoritative decision of the Supreme Court resolving plaintiffs' cause of action in their favor. Accordingly, plaintiffs, cloaking themselves in the robes of a prevailing party, currently seek attorneys' fees in the amounts set forth in previous affidavits, and further seek fees for the time incurred on defendants' appeal as well as fees and costs incurred in the continued litigation of the instant motion for fees and costs.[3]

## II. LEGISLATIVE IMMUNITY OF DEFENDANTS

Before reaching the issue of whether plaintiffs satisfy the eligibility requirements for an award of attorneys' fees pursuant to 42 U.S.C. § 1988, it is necessary as a threshold matter to address defendants' claim of insulation from liability on the grounds of legislative immunity. The defendants argue that attorneys' fees and costs may not be awarded since the defendants in this case stand merely as ministerial conduits through which the New Jersey Supreme Court acted *legislatively* both in promulgating its original 1977 policy prohibiting marriage and/or cohabitation between municipal court clerks and police officers and in modifying it via the 1992 directive. Defendants presently seek to shield themselves from any fee liability by grafting upon themselves the legislative immunity which they maintain is accorded the New Jersey Supreme Court in the instant case.

▮▮ Members of legislative bodies, whether national, state, or local, enjoy absolute immunity from suit based on their actions undertaken as part of the legislative process. *See Supreme Court of Virginia v. Consumers Union of the United States,* 446 U.S. 719, 732–33, 100 S.Ct. 1967, 1974–75, 64 L.Ed.2d 641 (1980). Individuals who are not legislators but whose acts have a substantial legislative nexus are also imbued with this absolute legislative immunity. *See generally Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975).[4] A legislative act involves " 'the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct.' " *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 580 (9th Cir.1984) (quoting *Yakus v. United States,* 321 U.S. 414, 424, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944)), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985). A judge or judicial body may have absolute legislative, as distinguished from judicial, immunity for actions which are in line with the legislative process (*e.g.,* actions involving the promulgation of binding rules of conduct). *Consumers Union,* 446 U.S. at 731–33, 100 S.Ct. at 1974–75.

---

**3.** Plaintiffs request additional sums of $1,335.00, Certification of Marsha Wenk, Dec. 23, 1993, at ¶ 7, and $2,465.00 in fees for the continued litigation of the instant motion. Supplemental Certification of Marsha Wenk, Mar. 8, 1994, at ¶ 6.

**4.** In *Green v. DeCamp,* 612 F.2d 368 (8th Cir. 1980), for example, the Eighth Circuit extended legislative immunity to counsel for a state senate investigative committee, concluding that as a legislative aide he had the same protection as the senators. The court predicated its analysis on the *Gravel* and *Eastland* decisions which held that the Speech or Debate Clause of the Constitution sheltered legislative aides as well as legislators. The immunity enjoyed by legislators from suits under § 1983 is similar in origin and purpose to that accorded Members of Congress via the Speech or Debate Clause. *Consumers Union,* 446 U.S. at 732, 100 S.Ct. at 1974.

To buttress their defense of legislative immunity defendants rely almost exclusively upon *Supreme Court of Virginia v. Consumers Union of the United States, Inc.* In *Consumers Union,* the plaintiffs brought a civil rights action pursuant to 42 U.S.C. § 1983 against the Virginia Supreme Court, the Virginia State Bar, the American Bar Association, and, both in their individual and official capacities, the Chief Justice of the Virginia Supreme Court, the president of the state bar, and the chairman of the state bar's Legal Ethics Committee. Plaintiffs sought a declaration that the defendants had violated the First and Fourteenth Amendments by promulgating and enforcing the Virginia Code of Professional Responsibility which, *inter alia,* prohibited attorney advertising. *Consumers Union,* 446 U.S. at 725–26, 100 S.Ct. at 1971–72. The district court found the advertising ban unconstitutional and permanently enjoined its enforcement, and furthermore awarded attorneys' fees against the Virginia Supreme Court and its Chief Justice in his official capacity. *Id.* at 728, 100 S.Ct. at 1973.

While upholding the injunctive relief entered against the Virginia Court, the United States Supreme Court vacated the award of attorneys' fees, holding that the Virginia Supreme Court, in promulgating the disciplinary rule at issue, acted in a legislative capacity such that the court and its members were immune from suit. *Id.* at 733–34, 100 S.Ct. at 1976. *See also Alia v. Michigan Supreme Court,* 906 F.2d 1100, 1101–02 (6th Cir.1990) (employing *Consumers Union* to legislatively immunize state supreme court that had promulgated a mediation rule governing state trial courts).

When the holding of *Consumers Union* is juxtaposed against the case at bar, it is apparent that the New Jersey Supreme Court's promulgation of administrative directives constitutes legislative action to which absolute legislative immunity must attach. Just as in *Consumers Union,* where the Virginia Supreme Court claimed an inherent authority to regulate the Virginia bar and in fact exercised the state's entire legislative power with respect to that regulation, 446 U.S. at 734, 100 S.Ct. at 1976, the New Jersey Supreme Court similarly possesses the broadest possible administrative authority over its court system. *See Lichter v. County of Monmouth,* 114 N.J.Super. 343, 349, 276 A.2d 382 (App.Div.1971). Indeed, the court's own interpretation of the New Jersey constitution leaves "not the slightest doubt that this Court possesses plenary authority with respect to all matters touching upon the administration of the court system in New Jersey." *Passaic County Probation Officers' Ass'n v. County of Passaic,* 73 N.J. 247, 253, 374 A.2d 449 (1977).[5]

Additionally, insofar as the state supreme court's legislative activities are concerned, Judge Biunno of this Court has recognized that "when the Supreme Court acts by rule of administration for statutory courts of limited jurisdiction ... it acts as a legislature passing a statute." *Harriatt v. Lillo,* 452 F.Supp. 421, 423 (D.N.J.1978). Accordingly, in its promulgation of the 1992 Directive, and indeed in its issuance of the 1977 Bulletin Letter governing employment eligibility in the municipal courts,[6] the New Jersey Supreme Court acted in a legislative capacity such that there is no basis for an award of attorneys' fees against it.

Furthermore, while defendants have cited no case to this Court specifically extending a judicial body's legislative immunity to administrative court officials acting on its behalf, in the present action the principles of logic support placing the named defendants under the

---

5. The 1947 New Jersey Constitution contains the following provisions of particular relevance here:

The Supreme Court shall make rules governing the administration of all courts in the State, and, subject to law, the practice and procedure in all such courts. The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted.
N.J. Const. Art VI, § II, ¶ 3.

The Chief Justice of the Supreme Court shall be the administrative head of all courts in the State. He shall appoint an Administrative Director to serve at his pleasure.
N.J. Const. Art VI, § VII, ¶ 1.

6. Municipal courts are forums of limited jurisdiction, adjudicating minor offenses committed within their respective municipal territories. N.J.S.A. 2A:8–20. *See also Hughes,* 906 F.2d at 965.

protective buckler of the New Jersey Supreme Court's legislative immunity, at least with respect to the promulgation of the aforementioned directives. As defendants note, the New Jersey high court asserts its administrative power through the promulgation of administrative rules, with the Chief Justice empowered to promulgate binding directives issued either directly or through the Administrative Director of the Courts. *See State v. McNamara,* 212 N.J.Super. 102, 108–09, 514 A.2d 63 (App.Div.), *certif. denied,* 108 N.J. 210, 528 A.2d 30 (1986); *State v. Linares,* 192 N.J.Super. 391, 397–98, 470 A.2d 39 (Law Div.1983). In turn, the Director has the responsibility of promulgating and enforcing the administrative directives rendered by the Supreme Court and its Chief Justice. *See* N.J. Const. Art. VI, § VII, ¶ 1; N.J.Ct.R. 1:33–3.

When defendant Lipscher, as Administrative Director, promulgated both Directive No. 1–92 and the earlier municipal court bulletin letter, it is reasonable to assume, as defendants maintain, that he was acting in the course of his constitutionally and statutorily prescribed duties and exercising on behalf of the New Jersey Supreme Court its plenary administrative authority. In acting strictly within the context of mere promulgation of court directives, it also seems permissible to view defendant Lipscher as a ministerial conduit transmitting the general will of the state supreme court to lower-level judicial and administrative officials, as he is required to do. *See* N.J.Ct.R. 1:33–1.[7] After all, even a cursory review of the documents in question reveals that the Director did not *sua sponte* formulate the initial policy nor its retraction, but rather, simply acted to publish them throughout the court system.[8]

It is axiomatic that the umbrella of legislative immunity shelters not only the legislator, but also her aides and staff members if the conduct of the latter would be protected if performed by the legislator herself. *See Gravel v. United States,* 408 U.S. 606, 618, 92 S.Ct. 2614, 2623–24, 33 L.Ed.2d 583 (1972); *see also Aitchison v. Raffiani,* 708 F.2d 96, 99 (3rd Cir.1983) (borough attorney, acting as legal aide to borough council, entitled to absolute legislative immunity). In this context the Administrative Director's role is akin to that of a legislative aide or administrative assistant, in that the Director, like the aide, might be intimately involved in the formulation of policy but, like the aide, is not empowered to effect its adoption. This being the case, I presently find no reason, nor has any authority been located, to prevent me from extending to the state defendants the legislative immunity accorded the New Jersey Supreme Court as it relates to the promulgation of the directives.

However, this finding of legislative immunity in the promulgation arena does not foreclose the instant inquiry into the efficacy of any fee award, because plaintiffs' fee application is not predicated upon the promulgation of the directives, but rather, is based on their *enforcement,* or at the very least, the threat of their enforcement by the state defendants. Clearly, given the holding of *Consumers Union,* if the sole basis for plaintiffs' § 1983 action against defendants were the issuance of the aforementioned provisions, legislative immunity would foreclose recovery of attorneys' fees. However, defendants here have more than a promulgatory (*i.e.,* legislative) function; they also possess an enforcement responsibility,[9] which, as stated, forms the

---

7. The rule states in pertinent part:

   The Chief Justice of the Supreme Court shall be responsible for the administration of all courts in the State. To assist in those duties the Chief Justice shall appoint an Administrative Director of the Courts who shall serve at the pleasure of and report directly to the Chief Justice.

8. Both the 1977 Bulletin Letter and the 1992 Directive clearly indicate that the initiation of the policy barring marriage between municipal court clerks and police officers employed in the same municipality and its subsequent withdrawal were

each taken at the behest of the New Jersey Supreme Court.

9. The Administrative Director, for example, while vested with promulgative responsibilities from the state supreme court, simultaneously possesses a clear enforcement function. As the New Jersey court rules state:

   *The Administrative Director of the Courts shall be generally responsible for the enforcement of the rules, policies and directives of the Supreme Court and the Chief Justice relating to matters of administration.* At the direction of the Chief Justice and the Supreme Court, the Adminis-

basis of the instant fee application. Therefore, any proper analysis of defendants' claimed derivative legislative immunity must take into account their enforcement of the 1977 bulletin letter that initially placed Marie· Hughes' employment in jeopardy.

This Court has already examined *Consumers Union* in the context of defendants' immunity argument premised on promulgated "legislation." However, it is presently necessary to revisit that decision insofar as it addresses defendants' susceptibility to a fee award based on their enforcement actions. As noted above, in *Consumers Union* the United States Supreme Court, in vacating a fee award against the Virginia Court and its chief justice, held that where the Virginia Court acted in its legislative capacity, it was immune. *Consumers Union*, 446 U.S. at 734, 100 S.Ct. at 1975–76. However, the Court went on to state that:

> [T]he Virginia Court and its chief justice properly were held liable in their enforcement capacities. As already indicated, § 54–74 gives the Virginia Court independent authority of its own to initiate proceedings against attorneys. For this reason the Virginia Court and its members were proper defendants in a suit for declaratory and injunctive relief, just as other enforcement officers and agencies were.

*Id.* at 736, 100 S.Ct. at 1977. Although the district court's award, premised as it was on the Virginia Court's issuance of the disciplinary rule in question, could not stand, the Supreme Court did recognize the appropriateness of a fee award for the Virginia Court's, as well as the state bar's, enforcement role:

trative Director shall promulgate a compilation of administrative rules and directives relating to case processing, records and management information services, personnel, budgeting and such other matters as the Chief Justice of the Supreme Court shall direct. The Administrative Director also shall perform such other functions and duties as may be assigned by the Chief Justice or by rule of the Supreme Court. N.J.Ct.R. 1:33–3 (emphasis supplied). In addition, by statute the AOC as well as its Director have been granted administrative and enforcement powers to carry out the mandates of the Chief Justice of the New Jersey Supreme Court and to provide general supervisory support for

We are not convinced that it would be unfair to award fees against the State Bar, which by statute is designated as an administrative agency to help enforce the State Bar Code. Fee awards against enforcement officials are run-of-the-mill occurrences ... Nor would we disagree had the District Court awarded fees not only against the Bar but also against the Virginia Court because of its own direct enforcement role.

*Id.* at 739, 100 S.Ct. at 1978.[10] On remand, the Fourth Circuit awarded fees as against both the Virginia Court and the state bar, because "the Bar as well as the Virginia Court was properly liable to plaintiff by reason of the Bar's enforcement role." *Consumers Union of United States, Inc. v. Virginia State Bar*, 688 F.2d 218, 222 (4th Cir. 1982), *cert. denied*, 462 U.S. 1137, 103 S.Ct. 3124, 77 L.Ed.2d 1375 (1983).

It is patent, then, that while the New Jersey Supreme Court and the named defendants are insulated from any fee award as a result of their promulgation of the bulletin letter, they possess no immunity with respect to any actual enforcement of that directive against plaintiffs. Since plaintiffs do not allege that the Supreme Court had any enforcement role, and indeed in their Complaint did not name that court as a defendant, there is no need to consider the New Jersey Court's susceptibility to an award of attorneys' fees. Rather, plaintiffs' present fee application is predicated upon the enforcement actions taken against them by the named defendants, and it is to this end that the inquiry naturally progresses.

It is undisputed that, as defendants stressed at oral argument, the Third Circuit

the courts in New Jersey. *See, e.g.,* N.J.S.A. 2A:12–1 *et seq.*

10. One need not be overtly perspicacious to discern the factual parallels between the Virginia state bar, an administrative agency designed to aid disciplinary enforcement, and the New Jersey courts' Administrative Director, who is given enforcement authority pursuant to statute. If it would not be unfair, in the mind of the United States Supreme Court, to award fees against the former given its enforcement role, then clearly the latter is likewise amenable to a fee award for the same reasons.

viewed the scope of the Bulletin Letter's application as ambiguous. *See Hughes*, 906 F.2d at 965–66 ("[t]he bulletin is vague and its application to Mrs Hughes is not self-evident"). However, that court's uncertainty as to Marie Hughes' position within or without the ambit of the provision does not obviate the fact that defendant Roncati, in his response to the municipal court judge's inquiry regarding the bulletin's application to Mrs. Hughes, stated (as the Third Circuit noted in its opinion) that "he believed plaintiff was bound by the bulletin and directed, 'Pending resolution of this matter the Clerk is to be recused from any matter involving the spouse in Municipal Court.'" *Id.* at 962.

While on appellate review the notion that the 1977 directive applied to a sitting clerk who marries a police officer may have appeared speculative, *see id.* at 966, it is nonetheless difficult to view Dr. Roncati's action in mandating Marie Hughes' recusal from court business involving her husband as being anything other than an initial enforcement of the 1977 policy against plaintiffs. The fact that in the course of resolving the matter via litigation the bulletin letter's applicability to Marie Hughes was questioned does not retroactively negate defendants' initial response to the Hughes' marriage (*i.e.*, mandating recusal). Nor can it in any way erase Dr. Roncati's "suggestion" that Mrs. Hughes should either (1) proffer her resignation, or (2) file a petition to the New Jersey Supreme Court for an *ad hoc* consideration of her case.[11] Although it is conceded that the defendants agreed not to take any action which would jeopardize plaintiff's employment while the dispute remained in existence, *id.* at 967, this magnanimity on defendants' part surfaced only after Marie Hughes was first removed from certain employment responsibilities and then given the "option" of either quitting her job or seeking judicial review in order to keep it. Indeed, subsequent to the filing of this action, the municipal court judge of North Arlington received a letter from the Bergen County assignment judge which specifically limited the duties of Marie Hughes during the pendency of this litigation. *See* Plaintiffs' Letter Memorandum, Jan. 2, 1990, Ex. B. Consequently, while ultimate enforcement of the 1977 policy, *i.e.*, discharge from employment, never occurred, it is evident that defendants' conduct took the form of a threatened enforcement of the directive such that plaintiffs felt compelled to institute this action.[12]

Accordingly, it is clear from the foregoing that the defendants' actions at a minimum manifested an intent to apply the 1977 Bulletin Letter to plaintiffs. This conduct, then, is surely removed from the realm of mere ministerial promulgation of a directive, and is instead embedded in the sphere of enforcement, a sphere in which, as noted *supra*, legislative immunity does not apply.

Thus, that which *Consumers Union* giveth to the named defendants—namely, a derivative legislative immunity from the New Jersey Supreme Court *vis-a-vis* its promulgatory actions—it also taketh away as a result of the defendants' own enforcement activities. Legislative immunity "should not protect [defendants] when they step outside the function for which their immunity was designed."

---

11. The letter stated in pertinent part:
   The following inclusive options may be considered: 1) A resignation on the part of the clerk or the spouse. 2) The Clerk may petition the Supreme Court by letter to consider the case on an individual basis.
   Letter of Conrad J. Roncati, Aug. 19, 1988.

12. The finding that plaintiffs were under the apprehension of defendants' imminent enforcement of the 1977 policy is bolstered by Directive No. 10–88, promulgated on July 14, 1988 (three days prior to the Hughes' wedding) by defendant Lipscher on behalf of the New Jersey Supreme Court, which states, in reference to Bulletin Letter No. 5/6–77:
   The Court in the past has extended that policy to situations in which (a) a municipal court clerk marries a police officer, and (b) the son of a clerk joins the police force in the municipality.
   Directive No. 10–88, July 14, 1988. The broadly inclusive statement that the Bulletin applies to "a municipal court clerk [who] marries a police officer" seemingly encompasses the Hughes' situation. Moreover, since, as plaintiffs indicate in their papers, "appeals by other clerks [against whom the Bulletin was ostensibly enforced] to the Civil Service Commission, (now the Merit System Board, N.J.S.A. 11A:1–1 *et seq.*) were unsuccessful," Plaintiffs' Reply Brief at 14, it can be inferred that past enforcement of the 1977 policy had indeed occurred.

*May v. Cooperman,* 578 F.Supp. 1308, 1317 (D.N.J.1984), *aff'd,* 780 F.2d 240 (3rd Cir. 1985) (holding legislative immunity inapplicable to intervenor-defendants representing the New Jersey Legislature because defendants adopted quasi-enforcement role via intervention to defend challenged statute). In the instant case the defendants initially sought to apply the 1977 directive to the plaintiffs. By so doing defendants stepped out of their role as promulgators and into the role of enforcers. Consequently, I find that defendants may not presently assert legislative immunity as a defense to plaintiffs' application for attorneys' fees.[13]

## III. AWARD OF ATTORNEYS' FEES PURSUANT TO 42 U.S.C. § 1988

■ Section 1988 of Title 42 of the United States Code authorizes federal courts to award "reasonable attorney's fees" in civil rights actions to the "prevailing party." 42 U.S.C. § 1988. In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court emphasized that a prevailing party within the meaning of § 1988 is one who " 'succeed[s] on any significant issue in litigation which achieves some of the benefits the parties sought in bringing the suit.' " *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939 (citation omitted). "The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Id.* at 429, 103 S.Ct. at 1937, *quoting* H.R.Rep. No. 94–1558 at 1 (1976). Consequently, a prevailing plaintiff in a civil rights action is ordinarily entitled to recover for attorneys' fees unless so-called "special circumstances" would make the award unjust. *Id.*

### A. The Prevailing Party Standard

#### 1. Relief Sought and Benefits Achieved

The test to determine prevailing party status in this circuit is well established, *see Metropolitan Pittsburgh Crusade for Voters v. Pittsburgh,* 964 F.2d 244, 250 (3rd Cir. 1992), and sets out essentially a two-fold inquiry. *Dunn v. United States,* 842 F.2d 1420, 1433 (3rd Cir.1988). The first part of the test requires a court to determine "whether plaintiff achieved some of the benefit sought by the party bringing the suit." *Metropolitan Pittsburgh Crusade for Voters,* 964 F.2d at 250, *quoting Dunn,* 842 F.2d at 1433. *See also Morrison v. Ayoob,* 627 F.2d 669, 671 (3rd Cir.1980) (*per curiam* ), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981) ("[u]nder § 1988 the focus is on the relief actually obtained rather than any formal procedural labels"). An important aspect of this inquiry is the compari-

---

**13.** This Court does note the decision of the Ninth Circuit, *Gutierrez v. Municipal Court of Southeast Judicial Dist.,* 838 F.2d 1031 (9th Cir.1988), *vacated as moot,* 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989), which, despite its subsequent vacation by the United States Supreme Court, is of interest given its factual similarity to the present situation. In *Gutierrez,* a deputy municipal court clerk sought injunctive relief precluding enforcement of a rule, promulgated by the judges of the municipal court, which forbade court employees from speaking any language at work other than English, except when acting as translators. *Gutierrez,* 838 F.2d at 1036. In response to the litigation the judges contended that they were absolutely immune from suit because they acted in a legislative capacity in enacting the English-only rule. *Id.* at 1046. In rejecting the immunity claim, the Ninth Circuit noted that the promulgation of a rule governing the conduct of clerical employees is best characterized as an administrative, rather than a judicial or legislative, function. *Id.* at 1047. The court stated further:

Personnel rules govern what are essentially internal affairs of a particular employer and are in that respect markedly dissimilar from state bar disciplinary rules or land-use ordinances, for example, which are of general applicability, at least within an affected profession, industry or type of business. A work rule is not transformed into legislation merely because the employer is a public entity.

*Id.* (citations omitted). Because the judges acted in their capacity. as employers, and not quasi-legislators, when they promulgated the personnel rule, the court found them not entitled to any legislative immunity defense. *Id.* Although *Gutierrez,* as a result of its subsequent history, is clearly devoid of any preclusive effect such that present reliance on it in the legislative immunity context would be injudicious, *see Garcia v. Spun Steak Co.,* 998 F.2d 1480, 1487 n. 1 (9th Cir. 1993), the case does suggest an alternate method of dealing with defendants' claim of legislative immunity. However, while my decision today differs from *Gutierrez* since I presently find that the New Jersey Supreme Court acted in a legislative capacity in promulgating the 1977 and 1992 municipal court directives, both decisions ultimately achieve the same end result since in both cases the defendants were not legislatively immunized.

son of the relief plaintiff sought via the institution of the lawsuit with the relief finally obtained. *See Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 911 (3rd Cir.1985). "Plaintiffs will be prevailing parties even though the relief they obtained is not identical to the relief they specifically demanded, as long as the relief obtained is of the *same general type." Institutionalized Juveniles,* 758 F.2d at 912 (emphasis supplied). In most cases, a common-sense comparison between relief sought and relief obtained will be sufficient to indicate whether a party has prevailed. *Id.* at 911.

Insofar as this initial prong of the prevailing party inquiry is concerned, it is beyond question that plaintiffs have achieved the benefit they sought when they initially filed their lawsuit. Plaintiffs based their challenge to the 1977 Bulletin Letter on its provision for the termination of municipal court clerks who marry a police officer employed within the same municipality. The Complaint, although comprised of various constitutional, statutory and common law theories, was at bottom predicated solely on plaintiffs' desire to preclude permanently the enforcement of the 1977 policy. Directive No. 1–92, subsequently incorporated into Canon 7 and adopted in that form by the state supreme court, vindicated plaintiffs' position by eliminating from the Bulletin Letter those sections which may have mandated Marie Williams' termination from employment upon her marriage to Joseph Hughes. As plaintiffs state in their brief, "[a]s a result of this modification, plaintiff will retain her position and municipal court clerks throughout New Jersey, who after appointment marry or cohabit with a police officer, or whose spouse, child or parent subsequently becomes a po-

lice officer, *are no longer barred from continued employment."* Plaintiffs' Brief at 14. As such, using the Complaint as a benchmark to identify the conditions the lawsuit sought to change, it is plain that the New Jersey Supreme Court's repudiation of the policy provisions that would have compelled Mrs. Hughes' discharge represents, at a bare minimum, relief of the "same general type" that plaintiffs initially sought.[14]

■ It is conceded that, given the Third Circuit's call for abstention in this matter, plaintiffs never received a determination on the merits as to the legal theories they proffered.[15] Defendants seize upon this fact to argue that absent any judicial pronouncement that the New Jersey Supreme Court's prior policy was in fact unconstitutional, an award of attorneys' fees cannot issue. This contention, however, misconstrues the tenor of the prevailing party inquiry. It is well established that "relief need not be judicially decreed in order to justify a fee award under § 1988." *Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 2676, 96 L.Ed.2d 654 (1987). Rather, plaintiffs acquire prevailing party status even in the absence of a formal judicial decision if, for example, the suit produces voluntary action by the defendant that affords them all or some of the relief they sought through, *inter alia,* a monetary settlement or a change in conduct that redresses their grievances. *See Hewitt,* 482 U.S. at 760–61, 107 S.Ct. at 2675–76.

■ The Third Circuit has stated explicitly that its decisions "have never held that a plaintiff, in order to be entitled to attorneys' fees, had to be the prevailing judgment-winner in the district court itself." *Sullivan v. Commonwealth of Pennsylvania Dep't of La-*

---

**14.** Defendants would dissuade me from this conclusion by once again resorting to the argument that the New Jersey Supreme Court's modification of its 1977 policy via the issuance of the 1992 directive does not in any way represent a "victory" for plaintiffs since, given the Third Circuit's finding as to the Bulletin Letter's applicative ambiguity, there has never been any formal pronouncement by any entity, adjudicative or administrative, that the Bulletin Letter even applied to sitting clerks like Mrs. Hughes. However, as my analysis in Part II of this Opinion demonstrates, the defendants initially sought to apply the 1977 policy to Mrs. Hughes, notwith-

standing any ambiguity that subsequently was found to exist. Thus, it was from defendants' perhaps mistaken, but nonetheless real, application of the Bulletin Letter that plaintiffs sought, and achieved, relief through the state supreme court's promulgation of Directive No. 1–92. As such, defendants' reliance on this "retroactive ambiguity" argument is again misplaced.

**15.** The circuit emphasized that it "takes no position, nor intimates any view, on the merits of the federal constitutional issues raised by plaintiffs." *Hughes,* 906 F.2d at 967.

bor & Industry, 663 F.2d 443, 449 (3rd Cir. 1981), cert. denied, 455 U.S. 1020, 102 S.Ct. 1716, 72 L.Ed.2d 138 (1982). Indeed, the circuit has determined that a plaintiff may be a prevailing party even though judgment was actually awarded in favor of the defendant. See Ross v. Horn, 598 F.2d 1312, 1322 (3rd Cir.1979), cert. denied, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). "In assessing who is a prevailing party, we look to the substance of the litigation's outcome" and "refuse to give conclusive weight to the form of the judgment". Ross, 598 F.2d at 1322.[16] The substantive outcome of this litigation reveals that plaintiffs received all the significant benefits which prompted their decision to file suit, since the policy they challenged was superseded by a later directive that specifically allowed Marie Hughes to maintain her position as municipal court clerk notwithstanding her continued marital relationship with a member of that municipality's police force.

Moreover, the contention that plaintiffs should somehow be penalized because the federal abstention held any constitutional review in abeyance is simply untenable. Plaintiffs did not file their Complaint with the expectation that the federal court would stay its decisional hand; rather, they sought to invoke this Court's injunctive power to enjoin the enforcement of a directive which they believed impermissibly infringed upon their fundamental right of marriage. Clearly, the abstention allowed the New Jersey Supreme Court to direct defendants to change their position regarding Marie Hughes rather than have this Court do so. However, this self-corrective action neither alters the fact that at the time of filing suit defendants were applying the Bulletin Letter to plaintiffs, nor, more importantly, does it diminish the scope of the relief they ultimately obtained. Defendants cannot threaten enforcement of the directive, thereby compelling plaintiffs to litigate and then, because there was no decision on the merits, presently contend that plain-

tiffs are not entitled to fees. Indeed, to presently sanction such an assertion cuts against the dictates of logic and equity since (1) the Supreme Court's reformation of the policy in light of the abstention was in precise consonance with plaintiffs' desired relief, and (2) given the New Jersey Court's modification of the directive, plaintiffs were never afforded an opportunity to reassert their constitutional claims.

Finally, it is well known that " '[a] plaintiff is a prevailing party to the extent extrajudicial relief makes legal claims moot.' " Metropolitan Pittsburgh Crusade for Voters, 964 F.2d at 250, quoting Institutionalized Juveniles, 758 F.2d at 911. In the instant case, even defendants concede that the New Jersey Supreme Court's extrajudicial (i.e., legislative) issuance of the 1992 directive superseding the 1977 Bulletin Letter rendered further litigation in this matter moot. See Defendants' Brief at 22. Accordingly, for this reason, and for the reasons discussed above, I conclude that plaintiffs have satisfied the first part of the prevailing party inquiry in that the relief they obtained reflects, and is of the same general type, as the relief they sought. It is therefore now necessary for me to consider whether plaintiffs' realization of relief was in fact caused by their institution of litigation.

### 2. Causation

The standard in this circuit for determining whether the litigation is causally related to the relief obtained centers on "whether the litigation 'constituted a material contributing factor in bringing about the events that resulted in the obtaining of the desired relief.' " Metropolitan Pittsburgh Crusade for Voters, 964 F.2d at 250, quoting Dunn, 842 F.2d at 1433. While there must be some causal relationship between the lawsuit and the ultimate relief, "the action need not be the sole cause. Where there is more than one cause, the plaintiff is the prevailing

---

16. The court's decisions in this regard give effect to the congressional intent that "for purposes of the award of counsel fees [under § 1988], parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief." S.Rep. No. 94–1011, 94th Cong., 2d Sess. 5, reprinted in

[1976] U.S.Code Cong. & Ad.News 5908, 5912 (emphasis supplied). See also Metropolitan Pittsburgh Crusade for Voters, 964 F.2d at 250; Institutionalized Juveniles, 758 F.2d at 911; Morrison, 627 F.2d at 671; Sullivan, 663 F.2d at 448–49; Ashley v. Atlantic Richfield Co., 794 F.2d 128, 131 (3rd Cir.1986).

party if the action was a *material factor* in bringing about the defendant's action." *Morrison*, 627 F.2d at 671 (emphasis supplied); *see also United Handicapped Federation v. Andre*, 622 F.2d 342, 346–47 (8th Cir.1980) ("[i]t is not necessary for the plaintiff's lawsuit to be the sole cause or even the primary cause of defendants' decision to settle"). Furthermore, when determining the causal relationship, it is important to apply the most "expansive" definition of causation. *Dunn*, 842 F.2d at 1433. Accordingly, although the litigation must have been a motivating factor in ultimately bringing about the relief sought, it need not have been the *primum mobile*. *Institutionalized Juveniles*, 758 F.2d at 916.[17]

Additionally, causation may be established via the "catalyst theory," where even though "the litigation did not result in a favorable judgment, the pressure of the lawsuit was a material contributing factor in bringing about extrajudicial relief." *Wheeler v. Towanda Area School District*, 950 F.2d 128, 132 (3rd Cir.1991) (citations omitted). The Third Circuit has recently reaffirmed the vitality of the catalyst theory in ascertaining causation. *See Baumgartner v. Harrisburg Housing Authority*, 21 F.3d 541 (3rd Cir.1994). The catalyst theory, like the aforementioned causation analysis, does not require plaintiffs' action to be the singular cause of the relief obtained. Rather, "[w]here there are multiple causes, as long as the litigation was a material contributing factor, it is sufficient to establish causation." *Wheeler*, 950 F.2d at 132, *citing NAACP v. Wilmington Medical Ctr., Inc.*, 689 F.2d 1161, 1169 (3rd Cir.1982), *cert. denied*, 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983).[18]

When undertaking the causation inquiry, the cases indicate that it is proper to infer causation from an examination of the sequence of events that preceded the change in defendants' conduct. *See Morrison*, 627 F.2d at 672; *see also Metropolitan Pittsburgh Crusade for Voters*, 964 F.2d at 251. "'Clues to the provocative effects of the plaintiffs' legal efforts are often best gleaned from the chronology of events [since] defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways.'" *Metropolitan Pittsburgh Crusade for Voters*, 964 F.2d at 251, *quoting Posada v. Lamb County*, 716 F.2d 1066, 1072 (5th Cir.1983). A district court's conclusions regarding causation are largely dependent upon its experience with and own assessment of the facts and history of the litigation. *See Institutionalized Juveniles*, 758 F.2d at 916.

While this Court must make factual findings with regard to the causal relationship between the lawsuit and the change in defendants' conduct, *see Dunn*, 842 F.2d at 1434, the precise level of the chronological predicates necessary to trigger a finding of causation has not been definitively stated and has seemingly been left to a case-by-case determination. In *Institutionalized Juveniles v. Secretary of Public Welfare*, for example, the Third Circuit confronted the question of whether plaintiffs' legal challenge to Pennsylvania laws regarding "voluntary" admission and/or commitment of mentally-ill juveniles was in fact a material contributing cause of the Pennsylvania legislature's subsequent enactment of statutes and regulations which essentially granted the desired relief. The court in *Institutionalized Juveniles* based its finding of causation on several affidavits from

---

17. As noted *supra*, it is not necessary that this relief be obtained as a result of trying a case to judgment. Rather, it is now well settled that a party may be deemed "prevailing" if the litigation terminates in its favor via a consent decree, an out-of-court settlement, a voluntary cessation of the defendant's unlawful practices, or other mooting of the case where the plaintiff has vindicated his or her rights. *Doe v. Busbee*, 684 F.2d 1375, 1379 (11th Cir.1982).

18. An examination of both methodologies of determining causation reveals that, far from being inapposite or competing theories, they are com-

plementary in that each is predicated on the material contributing factor inquiry. That is, both methods ultimately seek to determine if the institution of litigation in some meaningful manner spurred the alteration or modification of defendants' conduct. Accordingly, the causation analysis which follows does not emphasize any semantic distinctions between the two causation tests, but rather simply focuses on the material influence that the Hughes' suit had on the defendants' modification of the 1977 Bulletin Letter in their favor.

Pennsylvania public officials which essentially confirmed that the lawsuit materially contributed to the passage of the remedial laws. *Institutionalized Juveniles,* 758 F.2d at 917. In so holding, the court referenced, *inter alia,* the statement of a state senator intimately involved with the legislation that the lawsuit was "an important catalyst" in bringing about the law's revisions. *Id.* at 897.

However, other cases in this circuit have found causation via a sequence of events analysis that was hardly replete with causation-specific affidavits or other sworn proofs. In *Morrison v. Ayoob,* for instance, the plaintiffs' contention that certain Pennsylvania county justices were violating criminal defendants' right to counsel was mooted when the justices stopped infringing that right after suit was filed. The Third Circuit upheld the finding that plaintiffs' legal action was a material factor in effecting the desired relief on the basis of the connection between the institution of the lawsuit and the cessation of defendants' activity. *Morrison,* 627 F.2d at 671–72.

The defendants in *Morrison* argued that the litigation played no part in their change of conduct, and instead pointed to a letter from the county's president judge instructing them to cease their constitutionally infirm activity, as well as a binding appellate decision which ruled their conduct impermissible, as being the cause of their eventual compliance. *Id.* The Third Circuit, in rejecting that position, stated:

> Even assuming the president judge's letter and the other judge's ruling had absolutely no connection with [plaintiffs'] action, the district court's necessary conclusion that the action was a material factor was not clearly erroneous. The plaintiffs' counsel,

the only witness, testified that he communicated with some of the defendants informally prior to filing this action. After this action was filed, counsel for both sides met and discussed the case.

> This sequence of events strongly suggests that the action was a material factor in bringing about the defendants' change in conduct. Even though the defendants knew about possible violations of *Argersinger* through informal communications, they did not stop until after this action was filed and their counsel discussed *Argersinger* with defendants.

*Id.* at 672.[19]

It is evident, then, that the court balanced its finding of causation on the rather limited fact that the defendants did not cease their conduct until (1) the suit was initiated, and (2) attorney dialogues took place. Though the chronological analysis in *Morrison* only consisted of a sequence of two events, it was plain to the court that, while the existence of other factors not connected to plaintiffs might have precluded their lawsuit from representing the sole cause of defendants' about-face, the alteration in defendants' policy, coming as it did only after the commencement of litigation, was clearly in response to that suit. As such, the causative link could not be doubted.[20]

A review of the chronology of events in this case leads ineluctably to the same conclusion. Before proceeding to the present causation analysis, a brief recitation of the pertinent factual history is necessary and is noted presently:

1. May 1977: Bulletin Letter No. 5/6–77 is promulgated.

2. July 14, 1988: Directive No. 10–88 is promulgated, extending the 1977 policy

19. The plaintiffs in *Morrison* had initially challenged the defendants' practice of sending convicted indigents to jail for summary or petty offenses without first affording them a right to counsel where *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) so requires.

20. Obviously, the sequential inquiry employed in *Morrison* will not always support a finding of causation. In *Dunn v. United States,* for instance, the Third Circuit vacated a fee award in part as a result of errors made in the course of

the prevailing party inquiry. The court, applying the chronological analysis, held that the myriad of public meetings and other actions taken by the government in this environmental cleanup case *before* the institution of litigation left little doubt that no causal connection existed, even under the expansive view of causation. *Dunn,* 842 F.2d at 1434–35. The difference, of course, between *Dunn* and both *Morrison* and this case, is that the defendants in *Morrison,* like the defendants here, did not take any steps to alter or ameliorate their challenged policies until *after* suit was filed.

prohibiting marriage of municipal court clerk to police officer in same municipality to "those cohabitation situations that appear to be substantially similar to that of a marital relationship."

3. July 17, 1988: Marriage of Marie Williams to Joseph Hughes.

4. August 10, 1988: Letter of Municipal Court Judge Russello to Assignment Judge Ciolino of Bergen County requesting guidance as to 1977 Bulletin Letter's applicability to the Hughes' situation.

5. August 19, 1988: Letter of Conrad J. Roncati, Trial Court Administrator of Bergen County, responding to Judge Russello's inquiry.

6. February 3, 1989: Complaint filed in federal court.

7. September 8, 1989: Decision of this Court rendered.

8. June 29, 1990: Decision of Third Circuit Court of Appeals rendered.

10. January 1, 1992: Directive No. 1–92 is promulgated, specifically withdrawing portion of the 1977 policy and making clear that recusal in court matters involving the spouse is the only appropriate remedy when municipal court clerk marries a police officer employed by that municipality.

11. August 23, 1993: New Jersey Supreme Court adopts Canon 7.D of the Code of Conduct for Judiciary Employees, incorporating the restrictions imposed by Directive No. 1–92 and specifically referencing this Court's initial decision in this matter.

As one views the foregoing chronology of events it is apparent that the filing of plaintiffs' Complaint represents a demarcation line dividing defendants' issuance and threatened enforcement of the directive from that policy's subsequent modification/withdrawal. Before plaintiffs challenged the 1977 policy, all of defendants' actions taken with respect to it evince their support of it. Obviously, the directive's original promulgation in 1977 illustrates this. In addition, the 1988 directive, by both noting that the Bulletin Letter has been applied to municipal clerks who marry police officers and by extending that policy to cohabitation situations between such

individuals, demonstrates a further entrenchment and adherence to the policy. Finally, defendant Roncati's letter advising Marie Hughes to either resign or challenge the Bulletin Letter plainly exhibits the same administrative fidelity to the original directive.

Thus, it is significant in terms of causation that all the actions altering the policy in Marie Hughes' favor occurred only *after* she and her husband filed suit with this Court. The "actions" to which I refer are, of course, the issuance of Directive No. 1–92 and its subsequent incorporation into Canon 7.D by the New Jersey Supreme Court. An examination of both pronouncements reveals that each document references, either indirectly or directly, my initial decision in this case. The 1992 directive, for instance, reflects my original Opinion in that it unequivocally permits a marriage between an incumbent court administrator and a police officer employed within that municipality. Indeed, the directive specifically notes, "[the] former [1977] directive should not be interpreted as barring an administrator, after appointment, from such a marriage since the personal consequences of prohibition may be excessively severe." Comment to Dir. No. 1–92, Jan. 1, 1992. Moreover, Directive No. 1–92 also provides that a court administrator who is married to or cohabits with a police officer need only be disqualified (*i.e.*, recused) from municipal court matters in which the spouse is involved. Interestingly, this alteration mirrors precisely the remedy to the Bulletin Letter I initially suggested when I found the policy violative of plaintiffs' fundamental right to marry. *See Hughes*, 720 F.Supp. at 461 ("In the instant case, an effective recusal procedure ... can be employed for all persons affected by the terms of the Bulletin Letter to insure that court clerks and police officers in the same town or borough are never involved in the same municipal court case").

The fact that Directive No. 1–92 parallels my initial determination in terms of the ultimate end result does not *ipso facto* signify that my words were the catalyst behind the promulgation of that directive. Indeed, the suggestion that the directive's espousal of recusal was causally related to my decision

might have been confined to the realm of speculation were it not for the fact that Canon 7.D, in adopting the restrictions imposed by Directive No. 1–92, specifically references this Court's 1989 decision by explicitly adopting the "restrictions imposed by the various court directives following the decision in *Hughes v. Lipscher*, 720 F.Supp. 454 (D.N.J. 1989) ...", in spite of its subsequent vacation by the Third Circuit. Certainly there is no way to ascertain the extent to which plaintiffs' lawsuit, and my decision flowing therefrom, prompted the Supreme Court, and by extension, the named defendants to rethink and then reshape their policy. However, it is reasonable to infer from a review of the sequence of events in this case (namely, the filing of the suit and the subsequent alteration of the policy with clear reference to my decision) that, at the very least, the lawsuit materially contributed to plaintiffs' attainment of relief.

Clearly, it would be imprudent to conclude that the lawsuit provided the sole catalytic effect underlying this change. However, as noted *supra*, the action need not be the sole and/or proximate cause of the alteration in defendants' conduct. Just as in *Morrison*, where the Third Circuit found causation because ameliorative action took place only after suit was filed, in the instant case the modification of the Bulletin Letter was assayed only after Marie and Joseph Hughes instituted legal action. Thus, while the factual and chronological similarities between *Morrison* and the case at bar would, without more, support a finding of causation, such a determination in this case is doubly warranted when one considers that here the defendants' remedial measures made both implicit and explicit overtures to prior directives of this Court which were, of course, only entered in response to plaintiffs' initial commencement of the case.

Accordingly, for the reasons detailed above, I conclude that plaintiffs have satis-fied the second aspect of the prevailing party inquiry in that their institution of this litigation was in fact a material contributing cause of the alteration in policy. Thus, since plaintiffs have also met their initial burden of demonstrating that the relief they obtained reflects, and is of the same general type, as the relief they sought, I hereby conclude that plaintiffs are prevailing parties within the meaning of § 1988 such that they are eligible for an award of attorneys' fees. It is therefore necessary for me to determine a reasonable and appropriate award.

## IV. REASONABLENESS OF ATTORNEYS' FEES

Having established plaintiffs' entitlement to attorneys' fees, I now must fashion a fee award that is reasonable in the present circumstances. While § 1988 itself does not provide a touchstone for determining reasonableness, courts have often referred to the Fifth Circuit's decision in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), which delineated twelve factors pertinent to the reasonable fee inquiry.[21] As this Court noted in *McKenna v. Pacific Rail Service*, 817 F.Supp. 498, 519 (D.N.J.1993), the United States Supreme Court, in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1982), set forth a methodology as to how a § 1988 attorneys' fee application should be approached. The starting point for determining an award of fees is the product of "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. The plaintiff has the burden of proffering evidence in support of the number of hours worked and the hourly rates claimed. If the evidence documenting the number of hours is insufficient or inadequate, a court may reduce the award as may be appropriate. *Id.* Hours not "reasonably expended" should be excluded. After making this initial calculation, the court may upwardly or down-

---

**21.** The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717–19.

wardly adjust the fee award with particular reference to the "results obtained." An upward adjustment is appropriate only "in some cases of exceptional success." *Id.* at 435.

In this circuit the courts have developed a two-step inquiry for determining reasonable fees under § 1988 which has been termed the "lodestar" approach. First, the lodestar is set by multiplying the number of hours reasonably expended on a successful claim by a reasonable hourly rate for each attorney involved. Then, once the lodestar is ascertained, a court may modify the lodestar figure, taking into account such considerations as the quality of the work performed as evidenced by the work observed, the complexity of the issues involved and the recovery obtained. *See Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3rd Cir.1973) (*"Lindy I"*); *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 168 (3rd Cir.1975); *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 117 (3rd Cir.1976) (*"Lindy II"*).[22]

Defendants presently renew the contention raised in their initial opposition to plaintiffs'

application for attorneys' fees in November 1989 that the prosecution of this case by way of summary judgment motion and cross-motion for summary judgment should not reasonably require the utilization of six attorneys for the period of time set forth in the affidavits of plaintiffs' attorneys. Defendants also question the appropriateness of a nearly $1,500.00 photocopying bill and a $56.00 postage bill. *See* Defendants' Letter Memorandum, Nov. 22, 1989, at 8. Finally, defendants also contend that the fashioning of any fee award must not include any work done in relation to or in preparation for the federal abstention issue insofar as it was addressed before this Court or the Court of Appeals.[23]

After review of the documentation submitted with respect to this application, I find that an award of $41,743.25 in attorneys' fees and $3,127.97 in costs, for a total amount of $44,871.22, represents a reasonable award in this action. This figure represents the product of a reasonable number of hours expended by each attorney in furtherance of the action multiplied by a reasonable billing rate for each attorney.[24] Given my own independent examination of the affidavits detailing the fees claimed, I have reduced several fee claims made by plaintiffs' attorneys as detailed in footnote 25.[25]

---

**22.** In addition, in determining the reasonable rate in an attorney's fee application, a court must first determine "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). Under the *Blum* formulation, the court must ascertain whether "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 896 n. 11, 104 S.Ct. at 1547 n. 11.

**23.** The instant fee application does not include any time spent by plaintiffs' attorneys defending the appeal in the Third Circuit, *see* Supplemental Certification of Marsha Wenk, Esq., at ¶ 6, and indeed this Court does not award any fees for time expended on the appeal or for time directly incurred as to the abstention issue either before this Court or the Court of Appeals. In addition, defendants' concern that the ACLU–NJ may be converting money rightfully belonging to plaintiffs' by bringing this application may be assuaged by an examination of the Retainer Agreement, annexed as Exhibit C to plaintiffs' Letter Memorandum dated January 2, 1990, which makes it clear that any attorneys' fees that may be awarded are paid to the ACLU–NJ for its legal

program and any costs which are awarded may be used to reimburse the ACLU–NJ and the private, volunteer attorneys for out-of-pocket expenses.

**24.** Defendants do not contest the hourly billing rates of plaintiffs' various attorneys in view of their respective qualifications. *See* Defendants' Letter Memorandum, Nov. 22, 1989 at 8.

**25.** As for the fee claims with respect to the private attorneys, (1) I have disallowed 2.5 hours claimed by Lisa Agresti Carey (LAC) on 12/30/88 as being duplicative; (2) I have disallowed 3.6 hours claimed by LAC and 3.75 hours claimed by Jack M. Sabatino (JMS) on 2/6/89 as being duplicative; (3) I have disallowed the 4.5 hours claimed by LAC on 4/10/89 as its relates to the federal abstention issue; (4) I have disallowed 3.5 hours claimed by LAC and 3.5 hours claimed by Kevin H. Marino (KHM) on 4/18/89 as being duplicative; (5) I have disallowed 4.25 hours claimed by LAC and 4.25 hours claimed by KHM on 4/19/89 as being duplicative; (6) I have disallowed 2.25 hours claimed by LAC and 3.25 hours claimed by KHM on 4/20/89 as being duplicative; (7) I have disallowed 3.0 hours claimed by LAC and 3.7 hours claimed by KHM on 4/21/89 as

As a result of the foregoing reductions, the breakdown of the reasonable number of hours expended multiplied by the reasonable billing rate is as follows: (1) 160.5 hours of work performed by Lisa Agresti Carey, associate at the law firm of Robinson, Wayne & La Sala (now Robinson, St. John & Wayne),[26] at an hourly rate of $100.00; (2) 35.40 hours of work performed by Kevin H. Marino, then an associate at the law firm of Robinson, Wayne & La Sala, at an hourly rate of $125.00; (3) 68.75 hours of work performed by Jack M. Sabatino, a former member of the law firm of Robinson, Wayne & La Sala, at an hourly rate of $150.00; (4) 5.8 hours of work performed by Eric Neisser, formerly Legal Director of the ACLU–NJ, at an hourly rate of $175.00; (5) 5.9 hours of work performed by Elizabeth J. Miller, staff attorney to the ACLU–NJ, at an hourly rate of $100.00; (6) 31.6 hours of work performed by Paul W. Armstrong, at an hourly rate of $175.00; and (7) 26.35 hours of work performed by Marsha Wenk, presently Legal Director of the ACLU–NJ, at an hourly rate of $145.00. Accordingly, as noted above, the sum of $41,743.25 represents the total reasonable attorneys' fees awarded in this action and the sum of $3,127.97 represents the total costs reasonably incurred in the litigation of this matter. Additionally, this Court also finds that the success achieved was not "ex-

ceptional" warranting an upward adjustment of the award.

## V.   CONCLUSION

For the reasons expressed above, plaintiffs's application for attorneys' fees pursuant to 42 U.S.C. § 1988 is hereby **GRANTED** in part. Accordingly, $41,743.25 in attorneys' fees and $3,127.97 in costs, for a total of $44,871.22 is hereby awarded to plaintiffs.

An appropriate Order follows.

### *ORDER*

This matter having come before the Court on the application of plaintiffs for attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and the Court having fully reviewed the submissions of the parties, and the Court having heard oral argument, and for the reasons appearing more particularly in the Letter Opinion of this Court in the above-captioned matter dated May 16, 1994, and good cause having been shown,

**IT IS** on this 16th day of May, 1994 hereby

**ORDERED** that plaintiffs' application for attorneys' fees and costs pursuant to 42 U.S.C. § 1988 be and the same hereby is **GRANTED** and attorneys' fees are awarded in the amount of $41,743.25 and costs are

---

being duplicative; (8) I have disallowed 2.25 hours claimed by LAC and 3.6 hours claimed by KHM on 4/23/89 as being duplicative; (9) I have disallowed 2.25 hours claimed by LAC and 2.25 hours claimed by KHM on 4/24/89 as being duplicative; (10) I have disallowed 4.1 hours claimed by KHM and 2.0 hours claimed by LAC on 4/25/89 as being duplicative; (11) I have disallowed 1.25 hours claimed by LAC and 1.25 hours claimed by KHM on 6/26/89 as being duplicative; (12) I have disallowed 3.75 hours claimed by LAC and 2.55 hours claimed by KHM on 6/27/89 as being duplicative; (13) I have disallowed 2.5 hours claimed by LAC and 2.5 hours claimed by KHM on 6/28/89 as being duplicative; (14) I have disallowed the .60 hours claimed by the Robinson, Wayne law librarian; and (15) as to costs, I have reduced by one-half the claimed expenses for photocopying, such that only $748.00 in reproduction costs may be recovered and in addition, I have reduced by one-half the postage costs claimed by plaintiffs, such that only $27.93 in postage may be recovered.

As to Paul Armstrong, attorney for Joseph Hughes, I have reduced by one-half the fees

claimed on 1/28/89, 1/30/89, 2/3/89, 2/6/89, 2/10/89, 4/23/89, 6/27/89, 6/28/89, and 9/8/89 as being duplicative given the efforts of the other attorneys in the action. This reduces Mr. Armstrong's hours from the claimed amount of 53.1 to a reasonable amount of 31.6. Finally, insofar as the attorneys for the ACLU–NJ are concerned, I have reduced by one-half the fees claimed by Eric Neisser and Elizabeth J. Miller on 11/21/89, 1/27/89, 1/30/89, 3/17/89, 3/31/89, 4/7/89, 4/21/89, 4/25/89, 9/8/89, 9/21/89, 10/5/89, 10/9/89, and 10/10/89 as being duplicative. Therefore, this of course reduces Mr. Neisser's hours from a claimed 9.2 to their present level of 5.8. Ms. Miller's hours are reduced from a total of 9.3 hours to 5.9 hours. The 26.35 hours claimed by Marsha Wenk will not be reduced as no concerns of reasonableness and/or duplication are implicated as to her claimed fees.

**26.**   The private attorneys affiliated with Robinson, Wayne & La Sala acted as voluntary attorneys with the ACLU–NJ, and will not partake in the attorney fee award. *See* Plaintiffs' Letter Memorandum, Jan. 2, 1990, at 10.

awarded in the amount of $3,127.97 for a total award of $44,871.22.