

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-21-2007

# Baraka v. McGreevey

Precedential or Non-Precedential: Precedential

Docket No. 05-2361

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Baraka v. McGreevey" (2007). *2007 Decisions.* Paper 1380.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1380

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-2361

_____

AMIRI BARAKA,
                    Appellant

v.

JAMES E. McGREEVEY, individually;
*RICHARD J. CODEY, in his official capacity
as Acting Governor of the State of New Jersey;
STATE OF NEW JERSEY, a body corporate and politic;
NEW JERSEY STATE COUNCIL OF THE ARTS,
an agency and a body politic of the State of New Jersey;
SHARON HARRINGTON, individually and in her
official capacity as Chairperson of the
New Jersey State Council on the Arts;
JOHN DOES 1-10; MARY DOES 1-10;
UNKNOWN AGENCIES and
GOVERNMENT ENTITIES 1-10, unknown to plaintiff
at this time, individually and in their official capacities

*(Pursuant to Rule 43(c), F.R.A.P.)

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 04-cv-1959
(Honorable Garrett E. Brown, Jr.)

Argued April 24, 2006
Before:  SCIRICA, *Chief Judge*,
NYGAARD, *Circuit Judge*, and YOHN, *District Judge**

(Filed March 21, 2007)

WILLIAM D. MANNS, JR., ESQUIRE (ARGUED)
Lee & Sanchez
Nevada Court Mall
21-23 Court Street
Newark, New Jersey 07102

ROBERT T. PICKETT, ESQUIRE
15 Village Plaza, Suite 1C
South Orange, New Jersey 07079
        Attorneys for Appellant

*The Honorable William H. Yohn Jr., United States District
Judge for the Eastern District of Pennsylvania, sitting by
designation.

LEWIS A. SCHEINDLIN, ESQUIRE (ARGUED)
Office of Attorney General of New Jersey
Department of Law & Public Safety
Richard J. Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625
        Attorney for Appellees

---

OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

        This appeal arises from an action brought by Amiri
Baraka under 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. § 2201
against officials, employees, and entities of the State of New
Jersey. Baraka alleges defendants violated his constitutional
rights by eliminating his position as poet laureate of New Jersey.
The District Court dismissed Baraka's complaint under Fed. R.
Civ. P. 12(b)(6) for failure to state a claim upon which relief can
be granted. We will affirm.

## I.

        Amiri Baraka, a poet, was appointed poet laureate of
New Jersey in July 2002, by Governor James McGreevey, on
the recommendation of the New Jersey State Council for the
Arts. The New Jersey State Legislature created the position of

3

poet laureate in 1999 when it enacted P.L.1999, c.228 (codified at N.J. Stat. Ann. § 52:16A-26.9 (repealed 2003)).[1] The statute

---

[1] Section 52:16A-26.9, provided:

 a. There is hereby established the New Jersey William Carlos Williams Citation of Merit to be presented to a distinguished poet from New Jersey who shall be considered the poet laureate of the State of New Jersey for a period of two years. The poet laureate shall receive an honorarium of $10,000.

 b. The New Jersey Council for the Humanities, in consultation with the New Jersey State Council on the Arts, shall biennially appoint and convene a panel of four persons who are either distinguished poets or persons who represent a range of stylistic approaches in the field of poetry. Each member of the first such panel shall be from New Jersey. After the term of the first poet laureate and each subsequent poet laureate has expired, that person shall serve as one of the members of the panel for a period of two years and participate in the selection of the next poet laureate. The panel shall submit to the Governor the name of the poet to whom the citation of merit shall be presented and who shall be considered poet laureate of the State for the subsequent two years.

 c. The Governor shall present biennially the New

4

provided the governor would biennially appoint a State poet laureate who would serve for two years and receive an honorarium of $10,000. The poet laureate would promote poetry within the State and give at least two public readings each year. *Id.*

Two months after his appointment, Baraka read his poem entitled "Somebody Blew Up America" at the Geraldine R. Dodge Poetry Festival in Stanhope, New Jersey. The poem commented generally on American society and politics, and on terrorism, specifically referencing the terror attacks of September 11, 2001, and read, in part: "Who knew the World Trade Center was gonna get bombed/Who told 4000 Israeli

---

Jersey William Carlos Williams Citation of Merit.

d.    The poet laureate shall engage in activities to promote and encourage poetry within the State and shall give no fewer than two public readings within the State each year while the poet holds the laureate designation.

e.    The New Jersey Council for the Humanities, in consultation with the New Jersey State Council on the Arts, shall establish such guidelines as are deemed necessary to effectuate the purposes of this section.

5

workers at the Twin Towers to stay home that day/Why did Sharon stay away?"[2]

After an outcry, a spokesman for Governor McGreevey issued a statement that "[t]he governor strictly criticizes any racist or anti-Semite behavior. The style of Baraka's recent verse implies that Israelis had known about the September 11 terrorism attacks." (Second Am. Compl. ¶ 15.) Governor McGreevey asked Baraka to resign. Baraka refused, contending the poem was neither anti-Semitic nor racist.

Baraka alleges Governor McGreevey then instructed Sharon Harrington, the chair of the New Jersey State Council for the Arts, to withhold payment of the $10,000 honorarium. Baraka also alleges Governor McGreevey and other defendants "commenced a concerted campaign" to remove him from his position or to abolish the position of poet laureate altogether. Soon thereafter, the New Jersey State Legislature passed P.L. 2003, c. 123, which repealed section 52:16A-26.9 and abolished

---

[2] The full text of the poem is available at a Web page registered to Baraka, http://www.amiribaraka.com/blew.html (last visited on March 15, 2007).

the position of poet laureate.[3]  Governor McGreevey signed the repealer into law on July 2, 2003.

Baraka filed a complaint under 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. § 2201 against Governor McGreevey, in his individual and official capacities, Harrington, in her individual and official capacities, the New Jersey State Council for the Arts, the State of New Jersey, and various unknown employees, agents, legislative officials, and entities of the State of New Jersey, in their individual and official capacities.  Baraka alleged that by abolishing the position of poet laureate and denying him the honorarium to punish him for expressing his views, defendants violated his right to free speech under the First Amendment and his right to due process of law under the Fourteenth Amendment.  Baraka also alleged various causes of action under the New Jersey Constitution and New Jersey state law.  He requested payment of the $10,000-per-year honorarium for two years,[4] immediate reinstatement to the position of poet

---

[3] The bill lists nine state senators and three assembly members as sponsors, and fifteen state senators and fifty-five assembly members as co-sponsors.  It passed with 21 votes and 19 abstentions in the State Senate, and it passed the Assembly in a 69-to-2 vote. Laura Mansnerus, *New Jersey Assembly Votes to Cut Embattled Poet's Job*, N.Y. Times, July 2, 2003, at B2.

[4] On appeal, Baraka recognizes § 52:16A-26.9 provided for a single payment of $10,000 and not $10,000 per year.

laureate, compensatory and punitive damages, and attorneys' fees.

The District Court granted defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. The court dismissed Baraka's claims against the State, the Arts Council, and the unknown government employees and entities on the basis of Eleventh Amendment immunity. It dismissed the claims against Governor McGreevey and Harrington on the basis of absolute legislative immunity. The court dismissed Baraka's claim for the honorarium after concluding, under New Jersey law, he had no legally enforceable right to payment. It dismissed the claims against unknown government individuals and entities because Baraka failed to allege specific conduct on their part that led to his harm. In the absence of any viable federal claim, the court declined to exercise pendent jurisdiction over Baraka's state law claims.

On appeal, Baraka contends the District Court erred by: (1) holding Governor McGreevey and Harrington were protected by absolute legislative immunity; (2) holding Baraka was not deprived of a constitutionally protected property interest without due process of law; (3) declining to address Baraka's claim he was deprived of a constitutionally protected liberty interest; (4) dismissing the case as to various unknown

8

government individuals, entities, and agencies; and (5) failing to exercise pendent jurisdiction over the state law claims.[5]

## II.

The District Court had subject matter jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1331.  We have jurisdiction under 28 U.S.C. § 1291.  Our review of a district court's dismissal of a complaint under Rule 12(b)(6) is plenary.  *Vallies v. Sky Bank*, 432 F.3d 493, 494 (3d Cir. 2006).  A Rule 12(b)(6) motion will be granted "'if it appears to a certainty that no relief could be granted under any set of facts which could be proved.'" *Evancho v. Fisher,* 423 F.3d 347, 351 (3d Cir. 2005) (quoting *D.P. Enter. Inc. v. Bucks County Cmty. Coll.,* 725 F.2d 943, 944 (3d Cir. 1984)).  We must accept all factual allegations in Baraka's complaint as true, but we are not compelled to accept "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  We review a district court's dismissal of pendent state law claims for abuse of discretion.  *Markowitz v. Ne. Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990); *Cooley v. Pa. Hous. Fin. Agency,* 830 F.2d 469, 471 (3d Cir. 1987).

---

[5] Baraka does not appeal the District Court's holding that claims against the State, the Arts Council, and unknown government entities and employees in their official capacities were barred by the Eleventh Amendment.

## III.

### A.

Baraka contends his claims against Governor McGreevey and Harrington are not barred by legislative immunity because neither is a legislator and their actions were not legislative in nature. He contends their actions were political—advocating legislation—and administrative—targeting a single person for punitive treatment. We believe Governor McGreevey's and Harrington's actions are properly characterized as legislative and are entitled to immunity.

"Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). Legislative immunity shields from suit not only legislators, but also public officials outside of the legislative branch when they perform legislative functions. *See id.* (affording absolute legislative immunity to a mayor); *Sup. Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 734 (1980) (same, to the Virginia Supreme Court and its members); *Gallas v. Sup. Ct. of Pa.*, 211 F.3d 760, 776–77 (3d Cir. 2000) (same, to the Pennsylvania Supreme Court and its members); *Aitchison v. Raffiani*, 708 F.2d 96, 99 (3d Cir. 1983) (same, to members of a city council, a mayor, and a city attorney). The relevant question is whether Governor McGreevey and Chair Harrington's actions were "'in the sphere of legitimate legislative activity.'" *Bogan*, 523 U.S. at 54 (quoting *Tenney*, 341 U.S. at 376).

10

**1.**

In *Youngblood v. DeWeese,* 352 F.3d 836 (3d Cir. 2004), we addressed the distinction between legislative and political activities on the part of state legislators. As examples of legislative activities, we cited "voting for a resolution, subpoenaing and seizing property and records for a committee hearing, preparing investigative reports, addressing a congressional committee, and, of course, speaking before the legislative body in session." *Id.* at 840 (internal citations omitted). We contrasted these with examples of political activities, including "'a wide range of legitimate "errands" performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called "news letters" to constituents, news releases, and speeches delivered outside the Congress.'" *Id.* (quoting *United States v. Brewster,* 408 U.S. 501, 512 (1972)). In *Youngblood*, therefore, we used the term "political" to refer to patronage practices and activities by officials, not directly related to enacting legislation. Baraka also appears to use the term to express this narrow meaning.

But as these examples illustrate, activities by legislators that directly affect drafting, introducing, debating, passing or rejecting legislation, are "'an integral part of the deliberative and communicative processes,'" and are properly characterized as legislative, not political patronage. *Id.* (quoting *Gravel v. United States*, 408 U.S. 606, 625 (1972)). Activities that are "'casually or incidentally related to legislative affairs but not a

11

part of the legislative process itself,'" are not. *Id.* (quoting *Brewster,* 408 U.S. at 528).

Baraka describes the actions of Governor McGreevey and Harrington as "advocating and promoting legislation." He contends legislative immunity does not apply because they are not legislators and because these are political, not legislative, activities. But when a governor and a governor's appointee advocate bills to the legislature, they act in a legislative capacity.

Baraka appears to concede as much. He alleges Governor McGreevey and Harrington actively participated in the legislative process. The repealer was allegedly passed at the "urging, direction and request" (Second Am. Compl. ¶ 19) of defendants. It was signed into law by Governor McGreevey. As the District Court noted, "[t]he gravamen of [Baraka's] complaint is that Governor McGreevey and Harrington 'orchestrated and directed' the New Jersey legislature to abolish the position of Poet Laureate." *Baraka v. McGreevey*, No. 04-1959, slip op. at 6 (D. N.J. March 22, 2005). These actions were "an integral part of the deliberative and communicative processes," *Youngblood*, 352 F.3d at 840 (quotation omitted), by which the repealer was enacted, and fall squarely "'within the sphere of legitimate, legislative activity.'" *Id.* at 841 (quoting *Tenney*, 341 U.S. at 376).

In *Bogan*, the Supreme Court considered whether absolute legislative immunity applied to a mayor and to a member of a city council. 523 U.S. at 47. Both officials played

12

central roles in advocating, promoting, and passing an ordinance that eliminated a government office of which plaintiff was the sole employee. *Id.* In concluding absolute legislative immunity applied, the Court held the city council member's acts of voting for the ordinance were "in form, quintessentially legislative," and the mayor's acts of introducing a budget and signing the ordinance into law "also were formally legislative." *Id.* at 55.

Baraka contends he named Governor McGreevey as a defendant not because the Governor signed the repealer, but because he advocated and orchestrated the legislation that abolished the position of poet laureate. His argument appears to concede the Governor's actions were central, or integral, to the legislative process. The New Jersey Constitution authorizes the Governor to "recommend such measures as he may deem desirable," and to convene the Legislature "whenever in his opinion the public interest shall require." N.J. Const. art. V, § 1. The New Jersey Governor, therefore, is constitutionally authorized to recommend legislative measures. Furthermore, this is consistent with the type of activity designated as "legislative" in *Brewster* and *Youngblood*. As the Governor's appointee, Harrington's actions in advising and counseling Governor McGreevey and the Legislature are also legislative. *See Aitchison,* 708 F.2d at 99 (affording legislative immunity to an attorney who advised a city council in drafting an ordinance). Though neither Governor McGreevey nor Harrington were legislators, their actions as public officials in proposing and advocating the repealer are properly characterized as legislative.

13

Despite Baraka's characterization, his cause of action also necessarily encompasses the Governor's actions in signing the repealer into law.  The position of poet laureate was eliminated by legislative repealer, which required gubernatorial approval (absent legislative override of a veto).[6]  Governor McGreevey's act of signing the repealer into law is properly characterized as a legislative action, like those designated in *Brewster* and *Youngblood*.  *See Edwards v. United States,* 286 U.S. 482, 490 (1932) (noting "the legislative character of the President's function in approving or disapproving bills"); *Smiley v. Holm,* 285 U.S. 355, 372–73 (1932) (discussing a governor's actions in signing or vetoing a bill as part of the legislative process).

**2.**

Baraka's contention that defendants' actions were administrative does not change our conclusion.  As noted, Baraka contends that in abolishing the position of poet laureate,

---

[6] Like other state constitutions, the New Jersey Constitution grants the governor a role in the finalization of all legislation.  All legislation passed by both houses of the state Legislature must be presented to the governor, who is authorized to enact the law by signing it, or to veto the law by returning it to the legislature with objections.  If the governor takes no action within 45 days, the bill becomes law by default.  The Legislature can override a veto only by a two-thirds super-majority in both houses.  N.J. Const. art. V, § 1, par. 14.

defendants targeted him for punitive action and engaged in administrative—as opposed to legislative—activity.

In determining whether legislative immunity attaches to municipal actors engaging in arguably administrative activities, we ask whether the activities are "both substantively and procedurally legislative in nature." *In re Montgomery County,* 215 F.3d 367, 376 (3d Cir. 2000); *see Carver v. Foerster*, 102 F.3d 96, 100 (3d Cir. 1996) (asking whether the act is "substantively legislative," as involving "policy-making" or "line-drawing," and "procedurally legislative," as being "passed by means of established legislative procedures") (quoting *Ryan v. Burlington County*, 889 F.2d 1286, 1290–91 (3d Cir. 1989)); *see also Bogan*, 523 U.S. at 55 (affording legislative immunity to a non-legislator who performed functions that were substantively and procedurally legislative). In *Gallas* we explained this two-part inquiry:

> First, the act must be "substantively" legislative, i.e., legislative in character. Legislative acts are those which involve policy-making decision [sic] of a general scope or, to put it another way, legislation involves linedrawing. Where the decision affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration. In addition, the act must be "procedurally" legislative, that is, passed by means of established legislative procedures. This principle requires that

15

> constitutionally accepted procedures of enacting
> the legislation must be followed in order to assure
> that the act is a legitimate, reasoned decision
> representing the will of the people which the
> governing body has been chosen to serve.

211 F.3d at 774 (quoting *Ryan,* 889 F.2d at 1290–91).[7]

Here, defendants are public officers and state actors. Our cases differ as to whether the two-part substance/procedure inquiry, first applied to municipal actors, is also appropriate for actors at the state level. In *Gallas*, we applied the two-part inquiry to Pennsylvania Supreme Court justices and concluded the justices were entitled to legislative immunity for their actions in reorganizing one of the state's judicial districts. *Id.* But in other cases we declined to extend the two-part inquiry to state actors. *See Youngblood*, 352 F.3d at 841 n.4 ("We have since recognized . . . that the substance/procedure test was 'developed for municipalities,' where individual officials are more likely to perform a mixing of administrative and legislative functions, and thus have 'decline[d] to extend [the *Carver* ] analysis . . . to other levels of government.'") (quoting *Larsen v. Senate of the Commonwealth of Pa.,* 152 F.3d 240, 252 (3d Cir. 1998)) ("[B]ecause concerns for the separation of powers

---

[7] We further noted that in Ryan "we did not mean to imply that a legislative body, passing a de jure law affecting only a single person, would not be entitled to legislative immunity." *Gallas v. Sup. Ct. of Pa.*, 211 F.3d 760, 774 n.14 (3d Cir. 2000).

16

are often at a minimum at the municipal level, we decline to extend our analysis developed for municipalities to other levels of government."). Instead, we articulated the relevant inquiry as whether the actions in question were "within the sphere of legitimate, legislative activity." *Youngblood*, 352 F.3d at 841 (quoting *Tenney*, 341 U.S. at 376).[8]

---

[8] In *Youngblood*, we found support in Bogan for our decision not to apply the two-part inquiry. We stated,

> We similarly decline to apply the *Carver* analysis to this case, especially in light of language from the Supreme Court that, we believe, casts doubt on the propriety of using any separate test to examine municipal-level legislative immunity, *see Bogan,* 523 U.S. at 49, 118 S.Ct. 966 (holding that local legislators are "likewise" absolutely immune from suit under § 1983), particularly a two-part, substance/procedure test, *id.* at 55, 118 S.Ct. 966 (refusing to require that an act must be "legislative in substance" as well as of "formally legislative character" in order to be a legislative act).

352 F.3d at 841 n. 4. But the Court in *Bogan* did not "refuse" to require an act be both procedurally and substantively legislative for immunity to apply. Rather, it concluded that because the acts in question were legislative in both respects, there was no need to determine whether the procedurally legislative character of the actions was "alone sufficient to entitle petitioners to

17

Regardless of the level of government, we believe the two-part substance/procedure inquiry is helpful in analyzing whether a non-legislator performing allegedly administrative tasks is entitled to immunity.[9] We note that in *Youngblood* and *Larsen*—the cases declining to apply the two-part inquiry to state actors—there was no allegation that the actions in question were administrative, and no need for this inquiry as a means of distinguishing between administrative and legislative actions. *See Youngblood*, 352 F.3d at 840–41; *Larsen,* 152 F.3d at 252. In addition, these cases addressed legislators' actions. *Gallas,* in contrast, addressed non-legislators' actions. Here, we similarly address the actions of non-legislators (Governor

legislative immunity." *Bogan,* 523 U.S. at 55.

We believe *Bogan*'s analysis illustrates that the two-part substance/procedure inquiry provides a useful means of determining whether allegedly administrative actions meet the standard set forth by the Supreme Court—whether the actions are "in the sphere of legitimate legislative activity." *Bogan*, 523 U.S. at 54 (quoting *Tenney*, 341 U.S. at 376). We use the substance/procedure inquiry not to establish a separate and distinct standard for certain actors, but to determine whether the Court's standard has been met.

[9] In *Larsen,* we explained our decision not to apply the two-part inquiry to state actors. We noted, "concerns for the separation of powers are often at a minimum at the municipal level." 152 F.3d at 252.

18

McGreevey and Harrington) performing allegedly legislative tasks. In determining whether legislative immunity applies, it is relevant to ask whether Governor McGreevey's and Harrington's actions were both substantively and procedurally legislative. If they were, they meet the standard set by the Supreme Court—they were "in the sphere of legitimate legislative activity." *Bogan*, 523 U.S. at 54 (quoting *Tenney*, 341 U.S. at 376).

We have already focused on the procedural nature of Governor McGreevey's and Harrington's actions. We noted that their actions in recommending and, in the Governor's case, signing the repealer were similar to those of the defendants in *Bogan*—actions that were "in form, quintessentially legislative." *Bogan,* 523 U.S. at 55. We agreed with the District Court that "[t]he gravamen of [Baraka's] complaint is that Governor McGreevey and Harrington 'orchestrated and directed' the New Jersey legislature to abolish the position of Poet Laureate." *Baraka*, No. 04-1959, slip op. at 6. In sum, we concluded their actions were procedurally legislative.

Their actions in support of the repealer were also substantively legislative. This law, formally enacted, eliminated the position of poet laureate, a position that was legislatively created. Eliminating the position of poet laureate constitutes the type of "policy-making" that traditional legislation entails, and the actions here were substantively legislative. *See Gallas,* 211 F.3d at 774.

19

In the context of public employment, we have drawn a distinction between the elimination of a position and the termination of an individual employee. *See id.* at 775 ("[T]he elimination of a public employment position—as opposed to the firing of a single individual—constitutes a 'legislative' act."); *Montgomery County*, 215 F.3d at 377 (holding decision to terminate director of county department of housing services was administrative because "[f]iring a particular employee is a personnel decision that does not involve general policy making").

Nevertheless, Baraka contends the purpose of the repealer was to remove him specifically as poet laureate after he refused to resign, and its effect is better analogized to the termination of an individual's employment than to the elimination of a position. Baraka contends he was punished for his speech, which his detractors termed anti-Semitic. In his view, the intent and motive behind the purpose of the repealer was perceived anti-Semitism. But a defendant's intent and motive are immaterial to whether certain acts are entitled to legislative immunity. *See Bogan*, 523 U.S. at 54–55. Accordingly, Baraka's allegation as to Governor McGreevey's and Harrington's intent and motive—which we accept as true in reviewing the denial of a Fed. R. Civ. P. 12(b)(6) motion—cannot affect our analysis.

In *Bogan*, plaintiff alleged defendants' actions in passing an ordinance were motivated by racial animus, and were in retaliation for her exercise of First Amendment rights. *See id.*

20

at 47.  A jury agreed with plaintiff, finding defendants' actions had been motivated by a desire to punish plaintiff for her constitutionally protected speech.  Relying on this jury finding, the Court of Appeals for the First Circuit held that because defendants' actions targeted plaintiff, they were not legislative.  But the Supreme Court concluded the Court of Appeals "erroneously relied on [defendants'] subjective intent in resolving the logically prior question of whether their acts were legislative."  *Bogan,* 523 U.S. at 54.  The Court explained "it simply is 'not consonant with our scheme of government for a court to inquire into the motives of legislators.'"  *Id.* at 55 (emphasis omitted) (quoting *Tenney*, 341 U.S. at 377).  The relevant inquiry was whether, "stripped of all considerations of intent and motive, [defendants'] actions were legislative."  *Id.*

In *Youngblood*, a state representative contended two other representatives denied her adequate budget allocation for office staffing in retaliation for her complaints against their party leadership.  352 F.3d at 838.  Citing *Bogan* we emphasized that a court does not consider intent and motive to determine whether legislative immunity applies to a defendant's actions.  *Id.* at 841.  Defendants' acts of allocating office-staffing appropriations among individual representatives were legislative acts to which immunity extended.  *Id.* at 841.  It was immaterial that the acts may have been intended to punish the plaintiff because "legislators' motives are irrelevant to whether their activities enjoy legislative immunity."  *Id.* at 839–40; *see also Gallas*, 211 F.3d at 773 ("In determining whether an official is entitled to legislative immunity, we must focus on the nature of

21

the official's action rather than the official's motives or the title of his or her office.").

Baraka cites *Canary v. Osborn*, 211 F.3d 324 (6th Cir. 2000), and *Kamplain v. Curry Board of Commissioners*, 159 F.3d 1248 (10th Cir. 1998), in contending an improper motive is relevant to a court's determination of whether legislative immunity applies. But neither case supports this position. In *Canary*, the Court of Appeals for the Sixth Circuit concluded individual school board members were not entitled to absolute legislative immunity for their role in voting against the renewal of an employee's contract as an assistant principal. 211 F.3d at 330–31. Because they were assessing the performance and actions of an individual employee, their actions "did not have prospective implications that reach[ed] well beyond the particular occupant of the office," and accordingly were not covered by legislative immunity. *Id.* at 330 (quotation omitted). In *Kamplain*, the Court of Appeals for the Tenth Circuit concluded defendants acted in an administrative capacity foreclosing legislative immunity when they banned plaintiff's attendance, participation, and speech at meetings of a county board of commissioners. 159 F.3d at 1252. The court concluded, "[b]ecause the circumstances of this case did not concern the enactment or promulgation of public policy, we cannot say that the bans were related to any legislation or legislative function." *Id.* at 1252. Neither *Canary* nor *Kamplain* relied on defendants' subjective intent or motive in determining whether legislative immunity applied. Both cases cited *Bogan*'s directive that "[w]hether an act is legislative turns on the nature

22

of the act, rather than on the motive or intent of the official performing it." *See Canary,* 211 F.3d at 329; *Kamplain,* 159 F.3d at 1251.

Baraka asks us to do what the Supreme Court has labeled erroneous—"rel[y] on [defendants'] subjective intent in resolving the logically prior question of whether their acts were legislative." *Bogan,* 523 U.S. at 54. Governor McGreevey's and Harrington's subjective intent plays no role in our analysis of whether or not their acts were legislative. The relevant question is whether, "stripped of all considerations of intent and motive, [defendants'] actions were legislative." *Id.* at 55. Both in form and in substance, the actions of both defendants were legislative. Accordingly, the District Court did not err in holding Baraka's claims against them were barred by legislative immunity.

**3.**

Although we join in much of our dissenting colleague's views on the structure and history of the Speech and Debate Clause, we believe modern jurisprudence has amplified and transformed our understanding of this constitutional provision.

The separation of powers doctrine, and its attendant checks and balances, undergirds the development of the speech and debate protections afforded legislators by the United States and state constitutions. The Constitution's framers created a structure of government that would engender competition for power among the branches.

23

But the Constitution also establishes legislative functions for the president, quite similar to those established for the governor in the New Jersey Constitution and at issue here. Whether these legislative functions may entitle executive branch officers to absolute legislative immunity is a question the Supreme Court answered in *Tenney* and, more recently, in *Bogan*. We applied these standards in *Youngblood*, and we believe our decision here is consistent with both the Supreme Court's precedent and our own.

Our dissenting colleague insists legislative immunity is intended to shield only legislators. But this view disregards modern jurisprudence and, most strikingly, undercuts the Supreme Court's recent guidance on the issue, in *Bogan*, clearly extending absolute legislative immunity to a non-legislator public official (a mayor) who was integrally involved in the proposal, promotion and passage of legislation eliminating a municipal department. There the Supreme Court noted that "[a]bsolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity." *Bogan*, 523 U.S. at 54 (internal quotes omitted). Later, the Court noted "[w]e have recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions," adding that an executive's actions with respect to enacting legislation are "integral steps in the legislative process." *Id.* at 55. Subsequently, we noted this extension of legislative immunity to public officials outside the legislature in our description of Bogan. *See Youngblood*, 352 F.3d at 840 (Bogan held "municipal officials were immune from a plaintiff's

24

claim that the officials violated her civil rights when they enacted a budget that eliminated her position").

If our dissenting colleague's concern is that legislative immunity would be extended to basic lobbying activity, we cannot agree. This ignores the fundamentally different roles played by a governor and his appointees in the legislative process from those played by a private party who lobbies for legislation. As noted, the New Jersey Constitution requires the governor to play a role in enacting legislation, through signing or vetoing it. It also authorizes the governor to "recommend such measures as he may deem desirable," and to convene the Legislature "whenever in his opinion the public interest shall require." N.J. Const., art. V, § 1.[10] These functions are integral steps in the legislative process, authorized by the state Constitution to the governor and, by extension, his appointees. No private lobbyist can claim such a constitutional authority to participate in the legislative process.

**B.**

Baraka contends that even if legislative immunity bars his claim for damages, it does not bar his claim for reinstatement against Governor McGreevey and Harrington in their official

---

[10] The governor is additionally given broad power to grant pardons and reprieves, and to suspend and remit fines and forfeitures, powers that necessarily overlap with the powers assigned to the judicial branch of government. N.J. Const. art. V, § 2.

capacities. He notes that legislative immunity is a personal immunity defense, citing *Kentucky v. Graham*, 473 U.S. 159 (1985), for the proposition that personal immunity defenses are unavailable in official-capacity actions.

In *Kentucky*, the Court noted in dicta, "[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment." *Id.* at 167. *Kentucky* addressed whether a plaintiff—who prevailed in a suit against a governmental entity's employees in their personal capacities—could recover attorneys' fees from the entity. *Id.* at 161. It did not involve, as does this case, a claim for injunctive or declaratory relief. Accordingly, the case has limited relevance to determining whether legislative immunity bars Baraka's claim for reinstatement.

Moreover, in *Larsen*, we interpreted the Supreme Court's opinion in *Supreme Court of Virginia v. Consumers Union* to hold that at least in "appropriate cases," legislative immunity can apply to claims for declaratory and injunctive relief against officials in their official capacities.[11]  *See Larsen*, 152 F.3d at

_____

[11] We also concluded we erred in *Acierno v. Cloutier* when we stated "the Supreme Court has never held that legislative immunity applies to both claims for damages and injunctive relief." *Larsen*, 152 F.3d at 252 (citing *Acierno v. Cloutier,* 40 F.3d 597, 607 n.8 (3d Cir. 1994) (en banc)). We recognized that "in fact the Supreme Court in *Consumers Union* did resolve the

253; *Consumers Union*, 446 U.S. at 732. In determining whether a Pennsylvania Supreme Court justice's § 1983 claim for reinstatement against state senators who impeached him was an "appropriate case," we asked "whether Larsen's request for prospective relief from the Senators could be accorded consistent with the policies underlying legislative immunity." *Id.* Because Larsen sought "reinstatement—nothing less than that the individual senators rescind their guilty vote on this impeachment," we concluded: "It is difficult to imagine a remedy that would more directly interfere with the role assigned exclusively to the Senators by the Pennsylvania Constitution." *Id.* at 254. Accordingly, the senators were entitled to absolute legislative immunity.

Like the relief sought in *Larsen*, the relief sought by Baraka would infringe on the role of the New Jersey Legislature. Baraka seeks to require New Jersey legislators to rescind their votes repealing the statute and to enact legislation recreating the position. We agree with the District Court's conclusion that this "would be inconsistent with the general policies underlying legislative immunity," and "would seriously interfere with the role assigned exclusively to the Legislature." *Baraka*, No. 04-1959, slip op. at 8–9. Debating, voting on, and passing statutes are "role[s] assigned exclusively" to the Legislature, and this

issue of the application of absolute legislative immunity to claims for prospective relief and answered that question in the affirmative." *Id.* (citing *Sup. Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719 (1980)).

27

case is an "appropriate case" for application of legislative immunity to a claim for prospective relief. *Larsen,* 152 F.3d at 254. Accordingly, the District Court did not err in concluding that Baraka's request for reinstatement was barred by legislative immunity.

## C.

The District Court dismissed Baraka's claim for the honorarium because the Legislature never appropriated funds for payment of the $10,000 provided for by § 52:16A-26.9. In the absence of an appropriation, the court held, defendants were not authorized to pay Baraka the honorarium. Accordingly, there could be no liability for withholding payment.[12] The court explained that under the Appropriations Clause of the New Jersey State Constitution, funds can only be withdrawn from the State treasury by legislative appropriation. *See* N.J. Const. art. VIII, § 2, par. 2 ("No money shall be drawn from the State treasury but for appropriations made by law."); *see also* N.J. Stat. Ann. § 52:18-27 (West 2003) ("No money shall be drawn

---

[12] Baraka states the District Court held the legislature's failure to appropriate the $10,000 as of the date of Baraka's appointment "retroactively nullified," "repeal[ed]," or "eliminat[ed]" the honorarium provided by § 52:16A-26.9. This mischaracterizes the District Court's holding. Because the legislature had not appropriated funds to pay the honorarium, the court held defendants had no legal authority to withdraw the $10,000 from the state treasury to pay Baraka.

from the state treasury unless it has been explicitly appropriated to the purpose for which it was drawn."). The court cited the New Jersey Supreme Court's opinion in *Camden v. Byrne*, 411 A.2d 462, 470 (N.J. 1980), for the proposition that "[t]here can be no redress in the courts to overcome either the Legislature's action or refusal to take action pursuant to its constitutional power over state appropriations." The court rejected Baraka's contention that section 52:16A-26.9 vested in him a constitutionally protected property interest that overcame this mandate.

Under New Jersey law, a statute that devotes state revenue to a particular purpose needs a corresponding appropriation authorizing payment, and a court cannot compel the appropriation. *Camden,* 411 A.2d at 470. In *Camden*, municipalities challenged the State's failure to appropriate and expend funds in accordance with certain statutes that purported to devote tax revenues to local governments. The municipalities requested a court order requiring the legislature to make the necessary appropriations. *Id.* at 466. The court held the Appropriations Clause "firmly interdicts the expenditure of state monies through separate statutes not otherwise related to or integrated with the general appropriation act governing the state budget for a given fiscal year." *Id.* at 468. Furthermore, even if the requesting party could prove a statutorily defined substantive right, a court could not compel an appropriation. *Id.* at 469 (citing *Amantia v. Cantwell,* 213 A.2d 251 (N.J. App. Div. 1965); *see also New Jersey Div. of Youth & Family Serv. v. D.C.*, 571 A.2d 1295, 1301 (N.J. 1990) ("There can be no

29

redress in the courts to overcome either the Legislature's action or refusal to take action pursuant to its constitutional power over state appropriations. . . .  That principle applies even if a party is clearly entitled to compensation.").

Based on the timing of the appropriations process, Baraka contends the lack of an appropriation is immaterial to whether he was entitled to the honorarium.  He notes that in 1999—when the Legislature created the position of poet laureate—it appropriated $10,000 to pay the first person who held the position.  Since the first poet served for two years starting in early 2000, further appropriation was not needed until late 2002, when the next poet (Baraka) was appointed.  At this time, the Legislature had already adopted the State budget for fiscal year 2002–2003.  Baraka contends that had the position of poet laureate not been abolished in July, the appropriation would have been made in the budget for fiscal year 2003–2004.  But whether the Legislature's failure to appropriate funds was intentional or the result of indifference or oversight, the absence of an appropriation is determinative.  Regardless of the legislative intent, § 52:16A-26.9 could not authorize payment of the honorarium in the absence of a corresponding appropriation of state revenue.  Baraka's assertion that "it is undisputed that [defendants] refused to pay Baraka the $10,000 guaranteed by the statute" is inaccurate because it implies defendants were authorized to make a payment but chose not to do so.

There appears to be an exception to the general rule requiring a legislative appropriation.  If there is a constitutional

right to payment, a court may compel payment even in the absence of an appropriation. *See Youth & Family Serv.*, 571 A.2d at 1301; *Robinson v. Cahill*, 351 A.2d 713 (N.J. 1975). In *New Jersey Division of Youth and Family Services*, the issue was whether the New Jersey Supreme Court could require the legislature to disburse state funds to pay attorneys—appointed to represent indigent parents and their minor children—who were clearly entitled to compensation. The court qualified the principle that "[t]here can be no redress in the courts to overcome either the Legislature's action or refusal to take action pursuant to its constitutional power over state appropriations," by noting an exception "when funds are constitutionally mandated."[13] *Youth & Family Serv.*, 571 A.2d at 1301. Because

---

[13] The court also rejected the argument that it should find the necessary authorization in general statutory appropriation clauses. The court explained:

> [T]he statutory schemes for all departments, divisions, agencies and other units of State government include general-appropriation clauses. Thus, under its theory, we could always find that general-appropriation clauses enable us to compel the legislature to pay for whatever services we feel the state should provide. We are not persuaded that all general appropriation clauses necessarily give us such *carte blanche*.

*New Jersey Div. of Youth & Family Serv. v. D.C.*, 571 A.2d 1295, 1300 (1990).

the attorneys had no constitutional right to compensation, the court concluded the absence of a legislative appropriation was fatal to their claims. Here, whether the absence of an appropriation is fatal to Baraka's claims depends on whether payment of the honorarium was constitutionally mandated.

**D.**

Baraka contends payment of the honorarium was constitutionally mandated because New Jersey law vested in him constitutionally protected property and liberty interests when he was appointed to the position of poet laureate. He claims he was denied these interests without due process of law when the position was abolished and the $10,000 honorarium withheld.

In evaluating a procedural due process claim, we first determine "whether the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property." *Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir. 2000) (quotations omitted). Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id*.

32

"[T]he types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430 (1982) (quoting *Nat. Mut. Ins. Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 646 (1949) (Frankfurter, J., dissenting)). For example, individuals can have protected property interests in positions of public employment. *See Roth*, 408 U.S. at 576–77 ("[A] public college professor dismissed from an office held under tenure provisions and college professors and staff members dismissed during the terms of their contracts have interests in continued employment that are safeguarded by due process.") (internal citations omitted); *see also Slochower v. Bd. of Higher Educ.,* 350 U.S. 551, 559 (1956); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1134–35 (3d Cir. 1992). Baraka does not contend his protected property interest is based on an employment relationship with the State, nor would he succeed if he did. As poet laureate he was a state appointee—not an employee.[14] Rather, he contends § 52:16A-

---

[14] We look to New Jersey law in determining whether Baraka was a public employee. *See Bishop v. Wood*, 426 U.S. 341, 344 (1976) ("[T]he sufficiency of the claim of entitlement [to a property interest in employment] must be decided by reference to state law."). New Jersey courts use two different tests to determine whether an individual qualifies as an employee. *See Lowe v. Zarghami,* 731 A.2d 14, 19–20 (N.J. 1999). The "control test" considers the following factors: "(1) the degree of control exercised by the employer over the means of completing

33

26.9 created a "mutual understanding" with the State, which gave rise to a constitutionally protected property interest. He alleges both he and the State understood he was legally entitled to the honorarium.

Baraka cites *Stana v. School District of Pittsburgh,* 775 F.2d 122 (3d Cir. 1985), for the proposition that a mutual understanding can give rise to property interests. In *Stana,* we explained, "[p]roperty interests . . . can also arise from written or unwritten state or local government policies or from 'mutually explicit understandings' between a government employer and employee." *Id.* at 126. But we clarified "[i]n all

---

the work; (2) the source of the worker's compensation; (3) the source of the worker's equipment and resources; and (4) the employer's termination rights." *Id.* The "relative nature of the work test" considers "the extent of the economic dependence of the worker upon the business he serves and the relationship of the nature of his work to the operation of that business." *Id.* at 20 (quotation omitted). "Although used primarily in workers' compensation cases," this test is appropriate in other cases as well, such as those "involving work performed by professional employees," and where the nature of work necessarily involves independent, professional judgment. *Id.* at 20–21. Under either test, Baraka was not a state employee. The State did not exercise control over his work, provide him with facilities or resources, or pay him a regular salary. Baraka was not economically dependent on the State, nor was his work central to the operation of any State business.

cases, the relevant inquiry is whether the claimant has a 'legitimate claim of entitlement.'" *Id.* (quoting *Roth,* 408 U.S. at 577). Furthermore, the "mutually explicit understanding" in *Stana* grew out of an employment relationship. In holding a school employee's place on an employment eligibility list constituted a protected property interest, we accepted plaintiff's argument that the school district's policy for maintaining the list created a "'mutually explicit understanding' that a person who earned a place on the eligibility list will not be removed from the list for four years." *Id.* at 126. We noted the Supreme Court had "'frequently recognized the severity of depriving a person of the means of livelihood,'" *id.* at 128, and reasoned that Stana's interest in remaining on the list was analogous to the plaintiffs' employment interests in *Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985), where the Supreme Court referred to "'the significance of [an employee's] private interest in retaining employment.'" *Stana*, 775 F.2d at 128 (quoting *Loudermill*, 470 U.S. at 543). The employment relationship was central to our decision in *Stana*. Because Baraka did not hold a position of public employment, *Stana* is inapposite.

Furthermore, § 52:16A-26.9 shows no sign of a "mutually explicit understanding" that Baraka was entitled to the honorarium upon accepting the appointment. The statute provided for payment of an honorarium to the poet laureate, who, during a two-year period, would "engage in activities to promote and encourage poetry within the State." N.J. Stat. Ann. § 52:16A-26.9(d). The statute did not provide the poet laureate

35

would receive the honorarium upon appointment. Nor did it provide the poet laureate would be entitled to the honorarium whether or not he completed his term.

Terms in New Jersey statutes not otherwise defined are to be given their generally accepted meanings. N.J. Stat. Ann. § 1:1-1. An honorarium is generally defined as "an honorary payment or reward usually given as compensation for services on which custom or propriety forbids any fixed business price to be set or for which no payment can be enforced at law." Webster's Third International Dictionary (Unabridged) (1981); *see also* Oxford English Dictionary (2d ed. 1989) (defining an honorarium as "an honorary reward"). The statute did not create a "mutually explicit understanding" that Baraka was legally entitled to the honorarium upon appointment, giving rise to a property interest.

Nor did § 52:16A-26.9 create a contractual obligation giving rise to a property interest. As the District Court noted, "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *Baraka*, No. 04-1959, slip op. at 11 (quoting *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985)). The language of § 52:16A-26.9 does not demonstrate an intent on the part of the State to bind itself contractually. The statute provides "[t]he poet laureate shall receive an honorarium." § 52:16A-26.9. "Honorarium"

36

implies a voluntary payment and not a contractual obligation. We see nothing in the statute demonstrating the state intended to enter a formal contract with Baraka.

In a different context, the Supreme Court held that if there is no obligation to pay a benefit, there can be no legitimate claim of entitlement to the benefit. In *American Manufacturers Mutual Insurance Company v. Sullivan*, the Supreme Court held that because the Pennsylvania Workers Compensation Act entitles an employee with a valid claim to payment for "reasonable" and "necessary" medical treatment, "disputes over the reasonableness and necessity of particular treatment must be resolved *before* an employer's obligation to pay—and an employee's entitlement to benefits—arise." 526 U.S. 40, 60 (1999) (emphasis in original). Until the employee has a legitimate claim of entitlement to the benefit, there can be no constitutionally protected property interest. Here, too, because defendants were not obligated to pay—and Baraka was not entitled to receive—the honorarium, there can be no constitutionally protected property interest.

Moreover, even if the statute did create a contractual obligation, it would not confer a constitutionally protected property interest on Baraka. Only certain state contracts create protected property interests under the Fourteenth Amendment. *See Unger v. Nat'l. Residents Matching Program,* 928 F.2d 1392, 1397–98 (3d Cir. 1991). Generally, the two types of contracts that create protected property interests are those that confer a protected status—those "'characterized by a quality of

37

either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits'"—and those where "'the contract itself includes a provision that the state entity can terminate the contract only for cause.'" *Linan-Faye Const. Co., Inc. v. Hous. Auth. of Camden*, 49 F.3d 915, 932 (3d Cir. 1995) (quoting *Unger,* 928 F.2d at 1399).

Here, the right Baraka alleges the statute conferred—an honorarium—is neither a benefit on which Baraka relies in his daily life, nor a contract terminable only for cause. At most, § 52:16A-26.9 provided Baraka with a "unilateral expectation" of a voluntary award. *Roth,* 408 U.S. at 577. It did not provide him with a "legitimate claim of entitlement." *Id.* Nor is an honorarium a form of property on which he would rely in his daily life. *See id.* ("It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.").

Baraka also contends he has a constitutionally protected interest in his reputation, of which he was deprived when his position was eliminated.[15] He alleges defendants caused

_____

[15] Baraka contends he has a property interest in his reputation. Generally, if reputational harm implicates a constitutionally protected interest, it is a liberty interest. *See Paul v. Davis*, 424 U.S. 693, 711 (1976); *Kelly v. Borough of Sayreville, N.J.,* 107 F.3d 1073, 1077–78 (3d Cir. 1997). *But see San Filippo,* 961 F.2d at 1134 (implying reputational harm

38

"irreparable damage to his reputation, embarrassment, humiliation and emotional distress." Reputational harm can constitute a protected interest when coupled with an additional deprivation of a protected right or interest.[16] *See Paul v. Davis*,

_____

can constitute a deprivation of a protected property interest).

[16] Baraka cites *San Filippo* for the proposition that "[w]henever a 'person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' a property interest is involved and due process requirements apply." 961 F.2d at 1134 (quoting *Roth*, 408 U.S. at 572). In *Paul*, the Supreme Court recited a nearly identical statement. *See* 424 U.S. at 708 ("'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'") (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). The Court recognized this statement "could be taken to mean that if a government official defames a person, without more, the procedural requirements of the Due Process Clause of the Fourteenth Amendment are brought into play." *Id.* But the Court rejected this reading, which would represent "a significant broadening" of previous cases. *Id.* Instead, the Court read the phrase "because of what the government is doing to him," to refer to "the fact that the governmental action taken in that case deprived the individual of a right previously held under state law." *Id.* This right was "the right to purchase or obtain liquor in common with the rest

424 U.S. 693, 711–12 (1976) (holding reputation alone is not a constitutionally protected property or liberty interest); *see also Graham v. City of Philadelphia*, 402 F.3d 139, 142 (3d Cir. 2005); *Kelly v. Borough of Sayreville, N.J.,* 107 F.3d 1073, 1077–78 (3d Cir. 1997). In *Paul,* the Supreme Court noted that its case law did "not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul*, 424 U.S. at 701. We have noted some confusion whether the additional "more tangible interest" must be "a protectible property interest," or whether "something less than a property interest, independently protected by the Due Process Clause, could be [] sufficient." *Ersek v. Twp. of Springfield,* 102 F.3d 79, 83 n.5 (3d Cir. 1996); *see Graham*, 402 F.3d at 142 n.2. We need not decide the issue here. Baraka has pled no additional

of the citizenry," and the governmental action in question was a state statute that allowed government officials to post notices prohibiting sale of alcoholic beverages to certain people (including the plaintiff) because of their history of problems with alcohol. *Id.* The statute "significantly altered" the plaintiff's status under state law, and "it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards." *Id.* at 708–09. The Court's conclusion that reputational harm alone cannot form the basis of a due process claim was "reinforced by our discussion of the subject" in *Roth. Id.* at 709.

deprivation of a protected interest to couple with the alleged injury to his reputation.[17]  On a Fed. R. Civ. P. 12(b)(6) motion,

---

[17] Moreover, to state a valid claim for deprivation of a protected interest based on reputational harm, a plaintiff must allege harm that forecloses future opportunities.  In *Roth*, the plaintiff contended harm to his reputation, resulting from the non-renewal of his contract, amounted to deprivation of a protected liberty interest.  The Court acknowledged that "nonretention in one job . . . might make him somewhat less attractive to some other employers." *Roth*, 408 U.S. at 574 n.13.  But it concluded this harm "would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'"  *Id.*  In *Unger*, a plaintiff alleged harm to her reputation based on discontinuation of a university's graduate residency program, to which she had been accepted.  In addressing her claim for deprivation of a protected liberty interest in her reputation, we noted she had not alleged the university's actions had "imposed upon her a stigma or other disability that generally foreclosed her freedom to take advantage of other educational opportunities."  928 F.2d at 1396.  In other words, she had not established the "kind of foreclosure of opportunities" required by *Roth*. 408 U.S. at 574 n.13; *see also Ersek*, 102 F.3d at 84 (discussing the requisite showing of future harm to establish deprivation of liberty based on harm to reputation).  Here, Baraka alleges defendants caused "irreparable damage to his reputation, embarrassment, humiliation and emotional distress," but he does not specifically

we accept his allegations of reputational harm as true, but we conclude he has not stated an actionable claim for deprivation of a constitutionally protected interest in his reputation.

**E.**

Baraka also contends the District Court erred by "completely ignor[ing]" the deprivation of his liberty interest. He alleges defendants deprived him of his position and of the honorarium to punish him for his views, depriving him of a liberty interest without due process of law.

The liberty interests protected by procedural due process are broad in scope, including

> not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.

*Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Harm to reputation can, in certain circumstances, constitute deprivation of a liberty interest. *See Paul*, 424 U.S. at 711. But as noted, Baraka has not properly alleged a protected interest in his

allege a foreclosure of future opportunities.

42

reputation.  Baraka has not identified a protected liberty interest of which he was deprived.  Denial of continued public employment can also constitute deprivation of a liberty interest. *See Roth,* 408 U.S. at 573.  But Baraka was not employed by the state.  Accordingly, the District Court did not err in declining to address his free speech claim separately from his claim of a constitutionally protected property interest.

Nor can Baraka properly state a First Amendment retaliation claim.  Baraka contends he was denied a benefit—the $10,000 honorarium—in retaliation for his First Amendment expression.  But Baraka cannot state a viable claim that defendants denied him the honorarium to punish him for his views when defendants were not legally authorized to pay the honorarium because no appropriation was ever made. Accordingly, Baraka does not state a cognizable First Amendment claim.  The District Court did not err in holding defendants did not deprive Baraka of a constitutionally protected property or liberty interest, or infringe upon his First Amendment rights.

**F.**

The District Court dismissed Baraka's claims against various unknown government defendants because Baraka did not allege they engaged in specific behavior that contributed to his harm.  Furthermore, the District Court held that because there is no respondeat superior liability under § 1983, the named defendants could not be held liable for the actions of the unknown defendants.  A defendant in a civil rights action "must

43

have personal involvement in the alleged wrongs to be liable," *Sutton v. Rasheed*, 323 F.3d 236, 249 (3d Cir. 2003) (quotation omitted), and "cannot be held responsible for a constitutional violation which he or she neither participated in nor approved," *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 201 (3d Cir. 2000). Baraka does not allege specific, personal involvement on the part of the unknown defendants, and, accordingly, the District Court did not err in dismissing the claims against them.

Baraka contends "the Complaint clearly alleges that these [defendants] were part of 'a concerted campaign. . . to remove or terminate [him] from his state position.'" In his reply brief, he adds "more detail will be possible" once he "is able to obtain discovery to shed light on Defendants' actions." Baraka's vague references to the conduct of the unknown defendants are insufficient to constitute allegations that state a claim.

Moreover, Baraka's claims against the unknown defendants are barred by the Eleventh Amendment to the extent defendants are either state agencies or state officials sued in their official capacities. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of Newark*, 344 F.3d 335, 345 (3d Cir. 2003). His claims are barred by the doctrine of legislative immunity to the extent the claims are based on the involvement of these unidentified defendants in the passage of the legislation abolishing the position of poet laureate.

44

## G.

Baraka contends the District Court erred in declining to exercise pendent jurisdiction over his state law claims. The District Court noted "[w]here the federal claims are dismissed before trial, 'the district court must decline to decide pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" *Baraka*, No. 04-1959, slip op. at 12 (quoting *Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir. 1995)).

We have held "a refusal to exercise pendent jurisdiction over a state law claim after dismissal of all federal claims prior to trial is ordinarily not an abuse of discretion." *Edelstein v. Wilentz,* 812 F.2d 128, 134 (3d Cir. 1987). Here, it was not an abuse of discretion for the District Court to decline to exercise pendent jurisdiction after determining the considerations weighing in favor of pendent jurisdiction were not present.

## IV.

As noted, Baraka contends he was punished by the Governor and the New Jersey Legislature for speaking his views—views that were perceived to be anti-Semitic. His alleged punishment consisted of the elimination of the position of New Jersey poet laureate, which Baraka then held.

On a motion to dismiss, we accept the allegations as true–any set of facts will suffice, though we are not compelled to accept unwarranted inferences, unsupported conclusions or

45

legal conclusions disguised as factual allegations. *Schuylkill Energy*, 113 F.3d at 417*; Papasan*, 478 U.S. at 286.

This case turns not on Baraka's First Amendment right to speak his mind, but rather on whether he had a protected legal interest—constitutional or otherwise—in the continued existence of the position of New Jersey poet laureate, and his own holding of the post.

The Library of Congress began filling a position called "Consultant in Poetry" in 1937. In 1985, Congress passed legislation that changed the title of the post to United States Poet Laureate Consultant in Poetry to the Library of Congress. 2 U.S.C. § 177. The national poet laureate receives a stipend funded by a private gift. Some states began naming their own poets laureate earlier in the century, as early as 1919.[18] A review of the history of state poets laureate reveals that of the thirty-nine states that currently have a poet laureate, twenty-nine legislatures have codified their state poet laureate position; the remaining ten positions were created by executive order of the

---

[18] Detailed information on the history and current status of the poet laureate post in each state is available on the web site of the Library of Congress at: Main Reading Room, http://www.loc.gov/rr/main/poets/current.html (last visited on March 15, 2007). A history of the national poet laureate is available at: About the Position of Poet Laureate, http://www.loc.gov/poetry/about_laureate.html (last visited on March 17, 2007).

46

governor. These posts are typically described as "honorary," sometimes include a statutory provision for a modest stipend, but not always, and sometimes are left vacant. Some states have designated specific poets as poet laureate, either by executive order or legislation, and in several cases the post has run its course when its holder has died. Some states have codified a previously unofficial poet laureate post.

In summary, the position has historically been created by legislative or executive action. Thus, despite the undeniable artistic and cultural benefits of having a poet laureate, we are not aware that any state constitution requires the maintenance of the position, nor that any provision of any officially created poet laureate post protects it from appropriate official action (legislative or gubernatorial) designed to terminate it.

The New Jersey Legislature created the post of poet laureate through ordinary legislative action. The repeal of the post resulted from ordinary legislative acts by legislators and the governor. The statute contained no provision that protected it from the ordinary legislative process.

Baraka, like any person, was free to speak his views. But he had no protected legal interest in the maintenance of the position of poet laureate of New Jersey.

## V.

For the reasons set forth, we will affirm the judgment of the District Court.

NYGAARD, J., *dissenting*.

I respectfully dissent. In my view, the majority holding expands the legislative immunity privilege to insulate almost every action taken by executive branch officials having some connection, however remote, with the passage of legislative acts, subsumes in part the qualified immunity doctrine, and effectively abolishes accepted causes of action against executive branch officials who meddle in the affairs of, or otherwise insinuate themselves into, the legislative process.[19] I therefore dissent from that portion of the majority opinion which extends legislative immunity to former Governor McGreevey and Chairperson Harrington.

History and precedent make two things clear: First, there is no support for the claim that the protection afforded to legislators applies coextensively to non-legislators. Thus, the Majority's implication that the fact that Governor McGreevey and Ms. Harrington are not members of the New Jersey legislature is immaterial; and that they were acting in a legislative capacity when they "orchestrate[] and direct[]" bills through the legislature stands starkly at odds with both governing jurisprudence and the history of the doctrine. Second,

---

[19]There is no disagreement on this fact. What the majority specifically holds is that the actions which fall within the legislative immunity doctrine are Governor McGreevey's "orchestrat[ion] and direct[ion] [of] the New Jersey legislature to abolish the position of Poet Laureate." Maj. Op. at 12.

by extending the protections of legislative immunity to non-legislators who do more than propose legislation, but who "orchestrate[] and direct[]" legislative activities, the majority critically weakens the very foundation of the privilege, portending far-reaching results for both the vitality of the privilege and for its effect on the separation of powers.

Historically, the Speech and Debate Clause, from which legislative immunity is derived, was intended to preserve the independence and integrity of the Legislature *from* the Executive. It was designed to prevent other branches of the government from interfering with the legislators in the performance of their duties.[20] As Justice Harlan taught, "since

---

[20]The Speech and Debate Clause in Article I, Section 6, of our Constitution is the product of a long lineage of free speech or debate guarantees that began with the English Bill of Rights of 1689, continued on to some of the first state constitutions, and also appeared in the Articles of Confederation. *Id. (*citing *Tenney v. Brandhove*, 341 U.S. 367, 372-75 (1951). Because the principle was so firmly rooted, there was little discussion of the clause during the debates of the Constitutional Convention and it was hardly mentioned at all in the ratification debates. *Id.* Specifically, the Speech and Debate Clause provides that, "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. CONST. Art. I, Sect. 6, cl. 1; *see also Youngblood v. Deweese*, 352 F.3d 836, 839 (3d Cir. 2004).

the Glorious Revolution in Britain, and throughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature. In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." *United States v. Johnson*, 383 U.S. 169, 176, 86 S.Ct. 749, 754 (1966) (citing Story, *Commentaries on the Constitution*; *II The Works of James Wilson* 37-38 (Andrews ed. 1896)).

Given that the doctrine of legislative immunity derives from a clause located in Article I, I infer that its goal is to protect the Legislative branch from improper and untoward intrusions by non-legislators from either of the coordinate branches of government. Indeed, even when the question arises as to what conduct by legislators qualifies for immunity, the Supreme Court has cautioned that, "the courts have extended the privilege to matters beyond pure speech or debate in either House, but only when necessary to prevent indirect impairment of such deliberations." *Gravel v. United States*, 408 U.S. 606, 625 (1972). Here, instead of protecting the legislature from impairment of its deliberations, we are insulating executive intrusions into the function and deliberations of the legislature from suit. Importantly, the Supreme Court has specifically instructed that:

> the heart of the clause is speech or debate in either House, and insofar as the clause is construed to reach other matters, they must be an integral part

50

> of the deliberative and communicative processes
> by which Members participate in committee and
> House proceedings with respect to the
> consideration and passage or rejection of
> proposed legislation or with respect to other
> matters which the Constitution places within the
> jurisdiction of either House.

*Id.* Legislative immunity, as derived from the Speech and Debate Clause, is meant to apply to the legislative branch of government, not all who prowl the legislative halls to importune legislators on some pet cause or another.

The bedrock of our system of government is political competition between the legislative and executive branches. Put in more familiar parlance, Congress and the President would "check" and "balance" each other. The Framers believed that "the great problem to be solved" was to design governing institutions that would afford "practical security" against the excessive concentration of political power. *The Federalist Papers* No. 48 (Madison). As Madison explained, "a mere demarcation on parchment of the constitutional limits of the several departments is not a sufficient guard against those encroachments which lead to a tyrannical concentration of all the powers of government in the same hands." *Id*. at 308. As Professors Levinson and Pildes have pointed out, "the solution to this great problem was, instead, to link the power-seeking motives of public officials to the interests of their branches." Daryl J. Levinson and Richard H. Pildes, *Separation of Parties,*

*Not Powers,* 119 Harv. L. Rev. 2311, 2316-17 (June 2006). By giving "those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others," the Framers hoped to create a system in which competition for power among the branches would constrain each safely within its bounds. *Id. (*citing *The Federalist Papers* No. 51 (Madison), at 321-22).

Of course, it might be argued that the type of behavior at issue here is akin to such acts as preparing investigative reports, addressing a congressional committee, and speaking before a legislative body in session, all of which are accorded the imprimatur of legislative immunity. But, it is not. We have limited legislative immunity "to include activities that are an *integral* part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Youngblood*, 352 F.3d at 840 (quoting *Gravel,* 408 U.S. at 625 (1972)) (my emphasis). Nonetheless and conversely, legislative immunity will not extend "to acts that are casually or incidentally related to legislative affairs but not part of the legislative process itself." *Youngblood*, 352 F.3d at 840 (quoting *Brewster*, 408 U.S. at 513). Thus, to me, activities such as "orchestrat[ing] and direct[ing]" the New Jersey legislature into passing a personally targeted piece of legislation — be they undertaken by a governor or ordinary citizen — are activities which may be casually and incidentally related to

52

legislative affairs, but are not part of the legislative process itself. I would not take garden variety lobbying activity, even if undertaken by a state governor and his representative, and place such activity under the absolute protection of the privilege.

I agree with the majority that the New Jersey Constitution permits the Governor to recommend legislation to the General Assembly. But this does not support the majority's conclusion that the Governor's actions in "recommending" legislation is "formally legislative" and entitled to the protection of a legislative privilege. In my view the Constitutional prescription that a New Jersey governor may recommend legislation does not provide Constitutional imprimatur for him or other non-legislators, to "orchestrate[] and direct[]" the legislative process. I respectfully submit that the doctrine's scope as it applies to non-legislators simply does not map as the majority would have it, from its application to legislators, and, additionally, that there is no immunity for practices that merely *relate* to legislative activities. Instead, the central inquiry for non-legislators is whether the official was performing legislative functions, which the Supreme Court in *Bogan v. Scott-Harris* defined as acts that were "integral steps in the legislative process." *Bogan*, 523 U.S. 44, 55 (1998) (citing *Edwards v. United States*, 286 U.S. 482, 490 (1932)).[21]

_____

[21]The majority's opinion ignores the question of whether McGreevey's and Harrington's actions are "integral steps in the legislative process," focusing instead on whether their actions were undertaken within the "sphere of legislative activity." *See*

53

I also agree with the majority that formal aspects necessary to the legislative process - introduction of a bill and signing it into law – qualify for legislative immunity. But here, the governor and his aide went far beyond that. We have repeatedly cautioned that "a public official's legislative immunity from suit attaches only to those acts undertaken in a legislative capacity. *It is only with respect to the legislative powers delegated to them by the state legislatures that [non-legislative officials] are entitled to absolute immunity.*" *Carver*, 102 F.3d at 100 (my emphasis). "Absolute legislative immunity attaches to all actions taken in the sphere of *legitimate* legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)) (my emphasis). But the key questions following *Bogan* are, what is legitimate – what is legislative? Indeed, even for actual legislators, the Supreme Court has rejected a reading of the doctrine that would cover everything "related to the due functioning of the legislative process." *United States v. Brewster*, 408 U.S. 501, 513 (1972). Immunity includes "activities that are an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or

---

*Bogan*, 523 U.S. at 54. Many actions can be said to take place within the sphere of legislative activity — including lobbying. That does not mean, however, that all such actions are entitled to legislative immunity.

54

with respect to other matters which the Constitution places within the jurisdiction of either House." *Youngblood*, 352 F.3d at 840 (quoting *Gravel v. United States*, 408 U.S. 606, 625 (1972)). Conversely, legislative immunity will not extend "to acts that are casually or incidentally related to legislative affairs but not part of the legislative process itself." *Youngblood*, 352 F.3d at 840 (quoting *Brewster*, 408 U.S. at 513).

Because the roots of legislative immunity seek to protect the quintessentially legislative process, the doctrine should protect action that might be inhibited, frustrated or impaired by the threat of suit where that action is central to the legislative process. Viewed in this way, it is clear that broad extension of the doctrine advocated by the majority to non-legislators' actions does not show true fidelity to the underlying basis of the doctrine, which is to protect the legislative process, and would not follow the Supreme Court's caution that the doctrine be extended only when necessary to prevent impairment of the legislative function. Accordingly, I believe that only actions that are "integral steps in the legislative process," acts that are inextricably linked to, and necessary for, the passage of legislation are entitled to protection. I conclude that the actions averred in Baraka's complaint are not "integral steps in the legislative process," and, therefore, I would reverse the District Court.[22]

---

[22]The District Court grasped onto language contained within a 1994 District Court case, *Hughes v. Lipscher*, 852 F.Supp. 293 (D.N.J. 1994), for the proposition that "[i]ndividuals who are not

Finally, I point out that by concluding that McGreevey and Harrington are not entitled to absolute legislative immunity, we do not deprive them of other valid defenses. Qualified immunity remains not only a robust defense, but is the appropriate one where defendants are public officials in the executive branch. *See Dotzel v. Ashbridge*, 438 F.3d 320, 326 n.3 (3d Cir. 2006). It may be true that McGreevey and Harrington should be protected for their role in orchestrating and directing the passage of the bill about which Baraka complains; however, the appropriate defense for them is qualified immunity – not absolute legislative immunity.

Hence, I must respectfully dissent.

---

legislators but whose acts have a substantial legislative nexus are also imbued with this absolute legislative immunity." *Hughes*, 852 F.Supp. at 296. To the extent that it overreads and over-extends the scope of the immunity doctrine, it should be affirmatively rejected. Nowhere has this standard been explicitly advocated or adopted, especially not in the case cited for it support, *Gravel*. The "substantial nexus" test would envelop a much too broad set of behavior under the doctrine, allowing non-legislators to claim legislative immunity for acts not just integral to the legislative process generally (such as the signing or introducing of a bill) but also for acts that could be seen as lobbying, politicking, and the like. The doctrine was plainly not intended to cover such behavior, even for legislators.